194 P.3d 1126

**PONO, an unincorporated association; Walter Ritte, Jr.; Wayde Lee; Matthew Adolpho; and Joseph Kalipi, as individuals and members of Pono, Plaintiffs/Counterclaim Defendants–Appellants,**

and

**Halona Kaopu'iki, Plaintiff/Counterclaim Defendant–Appellee,**

v.

**MOLOKAI RANCH, LTD., a Hawai'i corporation, Defendant/Counterclaimant–Appellee,**

and

**James W. Mozley, Jr.; Charles Jencks, as an individual and in his capacity as Director of the County of Maui, Department of Public Works and Waste Management; Linda Crockett Lingle, as an individual and in her capacity as Mayor of the County of Maui; County of Maui, a governmental entity, Defendants–Appellees.**

No. 28359.

Intermediate Court of Appeals of Hawai'i.

Oct. 21, 2008.

David Kimo Frankel (Alan T. Murakami and Anthony F. Quan, Jr., with him on the briefs) (Native Hawaiian Legal Corporation), Honolulu, for plaintiffs/counterclaim defendants-appellants.

Gregory W. Kugle (Kenneth R. Kupchak, with him on the brief) (Damon Key Leong Kupchak Hastert), Honolulu, for defendant/counterclaimant-appellee.

Mary Blane Johnston, deputy corporation counsel (Jane E. Lovell, deputy corporation counsel, on the brief), County of Maui, for defendants-appellees County of Maui, Charles Jencks, and Linda Crockett Lingle.

WATANABE, Presiding J., and FUJISE, J.; with FOLEY, J., concurring separately.

Opinion of the Court by WATANABE, Presiding J.

This appeal concerns the development by Molokai Ranch, Ltd. (MR or Molokai Ranch) of fifteen commercial overnight campgrounds (Project) on agricultural lands with a soil classification rating of C, D, E, or U (also referred to as "non-prime agricultural lands") that are located along the "Great Molokai Ranch Trail" on the west end of Moloka'i. In June 1995, MR wrote to Linda Crockett Lingle, then-mayor of the County of Maui (Mayor Lingle), Charles Jencks (Jencks), then-director of the County of Maui, Department of Public Works and Waste Management (DPW), and other County of Maui (Maui County) officials to inquire whether the Project could be developed on non-prime agricultural lands and to determine what regulatory permits would be needed for the Project. (Mayor Lingle, Jencks, and Maui County are hereinafter collectively referred to as "Maui Defendants.") Jencks responded to MR by letter that the Project was a permitted use on non-prime agricultural lands and that the only permits required for the Project were building permits for the yurts, tent platforms, restrooms, pavilions, and other camping facilities to be constructed as part of the Project. Thereafter, MR obtained necessary building permits, began construction of camping facilities at different campgrounds, and began marketing the various campgrounds to prospective visitors to the island of Moloka'i.

On June 25, 1997, Pono, an unincorporated association, and several individuals who were

members of Pono[1] (collectively, Plaintiffs) brought the underlying action for declaratory judgment and injunctive relief against MR, James W. Mozley (Mozley),[2] and Maui Defendants[3] (collectively, Defendants), challenging the Project on multiple grounds and requesting that the Circuit Court of the Second Circuit (circuit court) enjoin further implementation of the Project and vacate any building permits issued to MR for the Project.

This appeal is taken from the Amended Final Judgment entered by the circuit court[4] on December 14, 2006 against Plaintiffs and implicitly in favor of MR and Maui Defendants (collectively, Appellees) as to Counts I through XIII of the Amended Complaint.[5] The Amended Final Judgment, which was certified as final for appeal purposes in accordance with Hawai‘i Rules of Civil Procedure (HRCP) Rule 54(b), reflected the "Order Granting [MR's] Motions No. 1, 2, 3, 4 and 7,[6] Filed August 19, 1998[sic],[7] and Denying [Plaintiffs'] Motion for Partial Summary Judgment No. 1,[8] Filed January 12, 2000[,]" entered by the circuit court[9] on April 28, 2000 (April 28, 2000 Order). In the April 28, 2000 Order, the circuit court determined, among other holdings, that (1) it lacked jurisdiction to determine Count I—Plaintiffs' claim that the Project violated Hawaii Revised Statutes (HRS) chapter 205, the state land use law (chapter 205 claim)—because Plaintiffs failed to exhaust their administrative remedies by appealing to the Maui County Board of Variance and Appeals (BVA); and (2) the Project did not violate the requirements of the Moloka‘i Community Plan (MCP) (Count VIII). The circuit court declined, on mootness grounds, to determine whether the Project violated HRS chapter 205.

In their notice of appeal filed on January 10, 2007, Appellants[10] challenged the circuit

---

1. Walter Ritte, Jr. (Ritte), Wayde Lee, Matthew Adolpho, Joseph Kalipi, and Halona Kaopu‘iki were the individual plaintiffs in the underlying lawsuit.

2. Mozley, who was MR's president and chief executive officer, was dismissed as a defendant by the "Final Judgment Dismissing Plaintiffs' Claims Against Defendant James W. Mozley," filed on September 2, 1997 and certified as final for appeal purposes pursuant to Hawai‘i Rules of Civil Procedure (HRCP) Rule 54(b).

3. Jencks and Mayor Lingle were sued in their individual and official capacities. Pursuant to a stipulation and order entered by the circuit court on October 5, 1998, the claims against both of them in their individual capacities were dismissed without prejudice.

4. The Honorable Joseph E. Cardoza entered the Amended Final Judgment.

5. The Amended Final Judgment entered judgment against Plaintiffs as to Counts I through XIII of their Amended Final Complaint but did not expressly indicate in whose favor judgment was being entered, nor resolve MR's counterclaims against Plaintiffs. Since Plaintiffs' claims against Mozley were dismissed, however, see footnote 2, the Amended Final Judgment was implicitly entered in favor of Appellees.

6. The April 28, 2000 Order resolved the following motions that were filed by MR regarding various counts of MR's first amended complaint:
    *Motion No. 1*. Motion for Partial Summary Judgment on Count IV, which alleged that the Project violated the requirement for an environmental assessment set forth in HRS chapter 343;
    *Motion No. 2*. Motion for Partial Summary Judgment on Count VIII, which alleged that the Project violated the requirement for conformity with the Moloka‘i Community Plan;
    *Motion No. 3*. Motion for Partial Summary Judgment on Count III, which alleged that the Project violated the Historic Preservation Law, HRS chapter 6E;
    *Motion No. 4*. Motion to Dismiss Count I, which alleged that the Project violated the state land use law, HRS chapter 205, for lack of subject matter jurisdiction; and
    *Motion No. 7*. Motion for Partial Summary Judgment on Count VII, which alleged that the Project violated a Maui County ordinance establishing special uses and stricter standards for agricultural districts.

7. The motions were actually filed on August 14, 1998.

8. Plaintiffs' Motion for Partial Summary Judgment No. 1 requested that the circuit court reject the court-appointed special master's recommended conclusion that the court lacked subject-matter jurisdiction of Plaintiffs' claims regarding the Project's violation of HRS chapter 205.

9. The Honorable Artemio C. Baxa entered the April 28, 2000 Order.

10. All of the Plaintiffs except Halona Kaopu‘iki are Appellants in this appeal.

court's decisions as to Counts I through XIII of Plaintiffs' Amended Complaint. In their Opening Brief, however, Appellants focused their arguments on the circuit court's rulings as to Counts I and VIII of their Amended Complaint and acknowledged that their appeal was directed towards MR, not the County Defendants. In summary, Appellants maintain that: (1) the circuit court erred in concluding that it lacked jurisdiction to determine whether MR's Project on agricultural land violates HRS chapter 205; (2) MR's Project on agricultural land violates HRS chapter 205 as a matter of law; and (3) MR's Project violates the MCP as a matter of law.

We conclude that Plaintiffs did not have authority to privately enforce HRS chapter 205 or the MCP against MR and, therefore, lacked standing to invoke the circuit court's jurisdiction to determine their chapter 205 and MCP claims.

Accordingly, we affirm the Amended Final Judgment and the April 28, 2000 Order.

## FACTUAL BACKGROUND

This case began on June 13, 1995, when Keith A. Fernandez (Fernandez), MR's vice president and general manager, wrote a letter to Mayor Lingle and an identical letter addressed collectively to Brian Miskae (Miskae), then-planning director for Maui County; Jencks; and Robert Johnson (Johnson), then-economic development coordinator for Maui County (Mayor Lingle, Miskae, Jencks, and Johnson are hereinafter collectively referred to as "Maui officials") regarding MR's "proposed camping facilities in combination with the 'Great Molokai Ranch Trail' program." The letter explained MR's vision for providing varied camping experiences and described three general categories of camps which MR sought to build:

1. Wilderness Camps. Areas set aside for the camper who wishes to provide his [or her] own tent and cooking capabilities. These sites would be provided with trail access, portable sanitary facilities and limited community accessories. Stays would probably be shorter in duration, typically one, two or three nights.

2. Nomadic Camps. Camping areas that could contain up to approximately 60 units. These units would consist of woodsman tents and/or yurts that could be portable and moved from one location to another depending upon seasons, varying weather conditions or programs. In addition to tent sites, these camps would contain self-composting toilets, showers, potable water and some form of camp center or pavilion from which to carry out get-togethers, lectures, community programs, etc.

3. Eco Camps. These camps could duplicate the Nomadic Camps but the tents would sit on wooden platforms. Tents and their platforms could be more permanent as would be self-composting toilets, showers, ancillary camp structures and a camp counselor's dwelling. These locations would be designated and located for year-round usages.

The letter then went on to request answers and assistance from Maui officials in several areas:

In order to establish our camping program and keep it as flexible as possible we need answers and your assistance in several areas.

a. Is a special use permit required for camping in the agricultural district on lands classified C, D, E, or V[sic]?

b. Are building permits required for all structures associated with a camp, ie [sic]: tent platforms, structures containing sanitary facilities, pavilions, camp counselor's quarters, etc.?

c. Are building permits required for portable wooden platforms or foundations for wall tents and yurts?

d. Does the tent or yurt unit by itself require a building permit? This question is directed at the canvas covering and supporting frame structure.

e. Are grading permits or other permits required for the construction of trails to interconnect the campsites?

f. Are any permits required from state agencies such as the Department of Health? If so—what agencies and what permits must be obtained?

g. Is a special use permit required for [MR's] existing camping programs on Ag lands classified C, D, E, or V[sic]? If a special use permit is required, should [MR] discontinue its current camping programs until this permit is obtained?

With regard to scheduling, [MR] wishes to commence construction on the Paniolo Campsite near Puu Nana as soon as possible in the hope of having it functional in November of 1995 for our annual rodeo. We envision the construction of approximately two campsites per year[;] consequently, it will take some five to six years to complete the entire network of trails and camps.

On July 18, 1995, Jencks responded to the questions posed in Fernandez's letter, as follows:

a. Section 205–4.5(c), Hawaii Revised Statutes (HRS), states that "within the agricultural district all lands, with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class C, D, E, or U shall be restricted to the uses permitted for agricultural districts as set forth in section 205–5(b)."

Section 205–5(b), HRS, then provides that "within agricultural districts, uses compatible to the activities described in section [ 205–2 ... shall be permitted."

Section 205–2, HRS, then goes on to say that. open area recreational facilities are allowed "provided that they are not located within agricultural district lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A or B."

Therefore, a special use permit is not required. However, should a fee be charged for use of the facilities, the operations may be designated as a visitor accommodation which is not appropriate for agricultural lands without a special use permit.

May we suggest you discuss this further with our Planning Department.

b. Yes.

c. Yes.

d. Yes. Only temporary tents used for private family parties or for camping do not require building permits.

e. Grading activity which does not change drainage patterns, disturb less than one acre of land and does not alter ground elevations more than 5 feet vertically may be exempted from permitting requirements.

f. The State Department of Health will probably need to be contacted relative to drinking water and sanitation requirements. We are not aware of other State requirements. However, you should not construe this to mean that there are no other State or Federal requirements.

g. See response (a). Any illegal activity should be discontinued until the proper approvals are obtained.

(Ellipsis in original.)

By a memorandum to Jencks dated August 2, 1995, David W. Blane (Blane), who had apparently succeeded Miskae as planning director for Maui County, expressed the Planning Department's comments to Jencks' July 18, 1995 letter to MR and Jencks's remarks at a meeting with MR officials on July 28, 1995:

1. The Planning Department believes it is a good idea for [MR] officials to meet with the Executive Officer of the State Land Use Commission [ (LUC) ] to discuss the matter of whether the proposed Great Molokai Trail project, contemplated by [MR], requires [an LUC] Special Use Permit.

2. The Planning Department maintains that overnight camping requires a Special Use Permit regardless of whether or not a fee is charged for the following reasons:

a. § 205–5(b), [HRS], states:

Within agricultural districts, uses compatible to the activities described in Section 205–2, as determined by the [LUC] shall be permitted; provided that accessory agricultural uses and services described in Sections 205–2 and 205–4.5 may be defined by each County by zoning ordinance. Other

uses may be allowed by special permits issued pursuant to this chapter.

b. § 15–15–25(b) of the [LUC's] Rules regarding *Permissible uses within the "A" agricultural district* states:

Permissible uses within the agricultural district land classified by the land study bureau's detailed land use classification as overall (master) productivity rating class of C, D, E, and U shall be those uses permitted in A and B lands as set forth in Section 205–4.5, HRS, and also those uses set forth in Section 205–2, HRS.

c. Section 205–4.5, HRS, lists open area recreational activities as a permitted use in Class "A" and "B" lands, but overnight camps are a prohibited use in these areas. Golf courses and golf driving ranges are also prohibited uses on Class "A" and "B" lands.

d. Golf courses and golf driving ranges are listed as permissible uses on Class "C", "D", "E", and "U" lands under Section 205–2, HRS. If overnight camps are a permitted use under Section 205–2, then why isn't it listed as a permitted use on Class C, D, E, and U lands, like golf courses and golf driving ranges?

e. § 15–15–23 of the State [LUC] Rules regarding *Permissible uses, generally* states:

Except as otherwise provided in this chapter, the following land and building uses are compatible and permitted within the following land use districts, except when applicable County ordinances or regulations are more restrictive. Except as otherwise provided in this chapter, uses not expressly permitted, are prohibited.

3. The Planning Department has processed [LUC] Special Use Permits for overnight camps such as Marvin Miura's proposed camp in Kula, Kamp Kaeleku in Hana, and most recently the Boy Scouts' Camp Wolford. Camp Wolford was a wilderness camp for the Boy Scouts. A public hearing on this matter was conducted by the Maui Planning Commission in April, 1995. In your department's comments on Camp Wolford, your department did not comment that a special permit was not required for the proposed action.

4. The [LUC] has reviewed special permit applications for various overnight campgrounds in the past.

5. If [MR's] attorney keeps referring to a letter which he wrote to Gary Zakian, Deputy Corporation Counsel, on this matter in August 1994, then why haven't we seen a written response on this matter from Gary Zakian on this matter? Our staff met with Gary Zakian to discuss this matter on July 27th; at no time during our discussion did Gary Zakian state that he felt overnight camping was a permitted use in the State Agricultural District.

6. § 15–15–29 of the State [LUC] [sic] regarding *Nonconforming uses of structures and lands* states that any lawful use of lands of [sic] buildings existing on April 9, 1962, may be continued even though those uses do not conform to the provision's intensity of use.

7. County government should be concerned with making a consistent interpretation which applies throughout Maui County. Should we say that the Boy Scouts need a Special Use Permit for a wilderness camp in the State Agricultural District on one hand and that [MR] does not need a Special Use Permit for the Great Molokai Trail on the other hand, provided that it does not charge a fee? Where is the consistency in interpretation? Either the use is or is not expressly permitted.

8. While your Department is by Charter the department authorized to make zoning interpretations, those interpretations must be made within the context of State and County laws, regulations, and other applicable ordinances.

9. We know that some individuals from Molokai will scrutinize everything as we found out from the Molokai MEO Special Management Area (SMA) and the Kalamaula Landfill Closure SMA. Shouldn't the Department of the Corporation Counsel have a say in this matter

as they represent our respective departments and the planning commissions?

10. The purpose of this memo is to enforce the idea that there should be consistency in the determination made by the County in similar situations whoever the applicant may be, whether it is the Boy Scouts or [MR]. In this case, the determination should be made considering the broader statewide context of permitted uses in the State Agricultural District.

Blane's memorandum closed with the hope that MR's discussions with LUC staff "will shed greater light."

Jencks [11] apparently disagreed with Blane's comments and in a letter to Fernandez dated December 11, 1995, reiterated his department's position that "camping is a permitted use in agricultural districts having a soil classification rating of C, D, E, or U" and furthermore, "charging for the use of [camping] facilities is allowed." Jencks explained the bases for his department's position as follows:

In discussing this matter with [MR] personnel, it was made clear to the department that all lands proposed for the camping activities have a rating of C, D, E or U. In Section 205–4.5(6) of HRS, there is a provision for uses such as riding stables and other activities which are already established within the properties owned by [MR] and for which the proposed camping facilities would seem to be a logical adjunct. [MR] has confirmed to this office that these activities are ones for which the public is already charged a fee.

As indicated in previous conversations, if uses such as golf courses and golf driving ranges are permitted within areas other than those designated A and B, logically C, D, E and U lands and the uses and activities normally associated with these activities are acceptable, then the development of camping sites as well [sic] the operation of a camp program as proposed by [MR] is permitted. Any reasonable description of either a golf course or golf driving range would include development of roads, parking lots, possibly multi-story structures to house equipment, offices and maintenance facilities and water, sewage and electrical service infrastructure as well. All of these uses would be more intense than the camping facilities and activities described above and proposed by [MR].

With regard to the issue of charging for the camping facilities, it is also the opinion of this department that since uses permitted for C, D, E and U lands logically include golf courses and driving ranges and other open area recreational uses, the issue of charging for the use of these facilities is allowed. In contrast, the idea of developing such facilities and operating them on a philanthropic basis does not make much sense. Once again, the department references present activities which are approved for A and B rated lands which appear to allow for the charging of fees such as riding stables and other such outdoor activities. In contrast, why would you not then allow for the charging of user fees for activities on C, D, E or U lands?

Relying on Jencks's opinion letters, MR did not apply for a special use permit [12] for

---

11. It appears from the record that Mayor Lingle agreed with Jencks's interpretation of HRS chapter 205's requirements for the use of non-prime agricultural lands.

12. At all times relevant to the case underlying this appeal, HRS § 205–6 (1993) provided, in pertinent part, as follows:

Special permit. (a) The county planning commission may permit unusual and reasonable uses within agricultural ... districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural ... district other than for an agricultural ... use, ... may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired. Each county may establish the appropriate fee for processing the special permit petition.

(b) The planning commission, upon consultation with the central coordinating agency, except in counties where the planning commission is advisory only in which case the central coordinating agency, shall establish by rule or regulation, the time within which the hearing and action on petition for special permit shall occur. The county planning commission shall notify the land use commission and such persons and agencies that may have an interest in

the different campgrounds of MR's Project. Soon after receiving Jencks's December 11, 1995 letter, MR applied to the DPW for, and was issued, approximately one hundred building permits for construction of different camping facilities along the Great Molokai Ranch Trail. In a declaration dated September 2, 1997, Richard Stack, MR's manager for the Project, attested that MR had expended "approximately over $8.3 million on the Project to date."

## PROCEDURAL BACKGROUND

### I. *The LUC Proceedings*

Plaintiffs began their challenge of the Project by filing a petition for a declaratory ruling or order (Petition) with the LUC on February 27, 1997, pursuant to HRS § 91–8 (1993)[13] and Hawaii Administrative Rules (HAR) § 15–15–98 (1986).[14] According to the Declaratory Order issued by the LUC on August 6, 1997, the Petition requested that the LUC

issue a Declaratory Ruling or Order on: 1) Are the fifteen (15) commercial "overnight campgrounds" that comprise the Great Molokai Ranch Trail Project, each containing numerous units rented on a short-term basis, permitted uses of agricultural lands rated C, D, E, and U; 2) Are the activities and uses proposed of such a nature and scope that, at minimum, a special use permit is required from the Molokai Planning Commission and the State Land Use Commission; and 3) Are the activities and uses proposed "urban-like" to the extent that a boundary amendment is required from the State Land Use Commission.

MR appeared specially before the LUC to challenge the LUC's jurisdiction to consider the Petition, claiming that enforcement of HRS chapter 205 as to the agricultural lands in question was vested in Maui County, not the LUC.[15]

the subject matter of the time and place of the hearing.

(c) The county planning commission may under such protective restrictions as may be deemed necessary, permit the desired use, but only when the use would promote the effectiveness and objectives of this chapter. A decision in favor of the applicant shall require a majority vote of the total membership of the county planning commission.

(d) Special permits for land area of which is greater than fifteen acres shall be subject to approval by the land use commission. The land use commission may impose additional restrictions as may be necessary or appropriate in granting such approval, including the adherence to representations made by the applicant.

(e) A copy of the decision together with the complete record of the proceedings before the county planning commission on all special permit requests involving a land area greater than fifteen acres shall be transmitted to the land use commission within sixty days after the decision is rendered. Within forty-five days after receipt of the complete record from the county planning commission, the land use commission shall act to approve, approve with modification, or deny the petition. A denial either by the county planning commission or by the land use commission, or a modification by the land use commission, as the case may be, of the desired use shall be appealable to the circuit court of the circuit in which the land is situated and shall be made pursuant to the Hawaii rules of civil procedure.

13. HRS § 91–8 provides as follows:

**Declaratory rulings by agencies.** Any interested person may petition an agency for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency. Each agency shall adopt rules prescribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition. Orders disposing of petitions in such cases shall have the same status as other agency orders.

14. HAR § 15–15–98 provided:

**Who may petition.** (a) On petition of an interested person, the commission may issue a declaratory order as to the applicability of any statutory provision or of any rule or order of the commission.

(b) Notwithstanding the other provisions of this subchapter, the commission, on its own motion or upon request but without notice of hearing, may issue a declaratory order to terminate a controversy or to remove uncertainty.

15. In 2004, the Hawai'i Supreme Court agreed with MR's position that enforcement of HRS chapter 205 is vested in the various counties, and not the LUC. In *Lanai Co. v. Land Use Comm'n*, 105 Hawai'i 296, 97 P.3d 372 (2004), the supreme court held:

The power to enforce the LUC's conditions and orders, . . . lies with the various counties. HRS § 205–12 (1993) delegates the power to enforce district classifications to the counties. HRS § 205–12 mandates that the "appropriate officer or agency charged with the administration of county zoning laws *shall enforce* . . . the

On April 11, 1997, after the LUC had scheduled a contested-case hearing on the Petition, MR filed a complaint in the circuit court (Civil Case No. 97–0258) against the LUC, the LUC commissioners, and Plaintiffs, appealing the LUC's decision to assert jurisdiction over the Petition and seeking to enjoin the LUC from holding a hearing on the Petition. However, the circuit court refused to enjoin the LUC from holding the hearing, as requested by MR, or to dismiss the complaint, as requested by the LUC and Plaintiffs.

Following a May 7, 1997 hearing held on the Petition, the LUC orally ruled that overnight campgrounds are not permitted uses on agricultural lands rated C, D, E, or U. On August 6, 1997, the LUC issued a written Declaratory Order in favor of Plaintiffs, which concluded, in relevant part, as follows:

3. The enacting statute, HRS Chapter 205, is very clear in prohibiting "overnight camps" as provided in HRS § 205–4.5(a)(6), "... but not including dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and *overnight camps:*" (emphasis added). However, the argument before [the LUC] was that this prohibition applies to only agricultural district lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A or B. The agricultural district lands in question are presumed to be rated C, D, E, or U.

4. HRS § 205–2 provides for "open area recreational facilities" upon agricultural district lands. "Open area recreational uses" is further defined in HRS § 205–4.5(a)(6): "[P]ublic and private open

use classification districts adopted by the [LUC] and the restriction on use and ... shall report to the commission all violations." (Emphasis added.) Pursuant to their enforcement duties under § 205–12, counties have the responsibility to take necessary action against violators. A.G. Opinion 70–72 (1970). Such enforcement covers all land use district classifications and land use district regulations. *Id.* Thus, looking to the express language of HRS § 205–12, it is clear and unambiguous that enforcement power resides with the appropriate officer or agency charged with the administration of county zoning laws, namely the counties, and not the LUC....

area types of recreational uses including *day camps,* picnic grounds, parks, and riding stables, but not including ... *overnight camps ....*" (Emphasis added).

5. HAR § 15–15–25(b), explicitly states that *permissible uses within C, D, E, and U agricultural lands are limited to those set forth in HRS § 205–4.5.* This specific language contemplates that the prohibition of "overnight camps" applies to non-prime agricultural lands.

6. HAR § 15–15–23 provides "uses not expressly permitted are prohibited." Neither the statutes nor the rules explicitly mention "overnight camps" as a permitted use. Therefore, the [LUC] is bound by the statute and rules to rule that "overnight camps" are not permitted uses in agricultural lands.

7. Statutory construction requires an interpretation acquired by reading separate but related sections of the statute in question together. Therefore, the interpretation is such that HRS Chapter 205 does not expressly or by any implication allow agricultural district lands to be used to accommodate overnight camps or dwellings where there is no apparent evidence of any activity for uses related to farming or animal husbandry.

8. HRS Section 205–12 provides the counties with the discretionary power to determine and enforce land use *violations.* This section does not delegate discretionary authority to determine permitted uses under the [LUC] Law. Home Rule authority lies with the expressed authority to use discretion in issuing special permits.

There is no provision in HRS § 205–12 that expressly delegates enforcement power to the LUC. If the legislature intended to grant the LUC enforcement powers, it could have expressly provided the LUC with such power.... By omitting any such reference, it is apparent the legislature did not intend to grant such enforcement powers to the LUC.... Thus, the LUC does not have the power to enforce a cease and desist order. However, if the LUC finds a violation of a condition, the county has the affirmative duty to enforce the LUC's conditions, according to HRS § 205–12.

105 Hawai'i at 318–19, 97 P.3d at 394 (footnotes omitted).

9. The plain reading of the statutory and rule provisions of Chapter 91, and Chapter 205, [HRS] and Chapter 15, [(HAR)] clearly provides jurisdiction to the [LUC] to address petitions for declaratory rulings and to determine permitted uses in agricultural lands. Also section 205–2 and section 205–4.5, [HRS], expressly prohibit the use of agriculture lands for "overnight camps." Section 91–1, [HRS] explicitly excludes section 91–8 declaratory rulings from its definition of "Rule." Therefore, there is no necessity for any Chapter 91, [HRS] rule-making procedures.

(Emphases in original.)

After the LUC issued its Declaratory Order, MR amended its complaint in Civil Case No. 97–0258 to allege that the LUC had violated due process and HRS chapter 92, the Sunshine Law, in entering the Declaratory Order. Maui Defendants filed their own appeal of the LUC's Declaratory Order (Civil Case No. 97–0695), contending that the Declaratory Order issued by the LUC was in violation of the Sunshine Law. The two cases were consolidated by the circuit court.

On November 13, 1997, despite the LUC's efforts to "cure" the Sunshine Law violations, the parties to Civil Case Nos. 97–0258 and 97–0695 stipulated, and the circuit court ordered, that "the LUC Declaratory Order issued and filed on August 6, 1997 . . . is void and of no legal effect."

## II. *The Underlying Complaint*

On May 19, 1997, while the LUC proceedings were still ongoing, Plaintiffs filed the complaint that commenced this lawsuit, asserting jurisdiction "pursuant to HRS §§ 6E–13,[16] 603–21.5,[17] 603–21.7(b),[18] 632–1,[19] and Article XI, Sec. 9, Hawaii Constitu-

---

16. At the time the complaint was filed, HRS § 6E–13 (1993) provided:

> **Enforcement.** (a) In addition to, and without limiting the other powers of the attorney general and without altering or waiving any criminal penalty provisions of this chapter [("Historic Preservation")], the attorney general shall have the power to bring an action in the name of the State in any court of competent jurisdiction for restraining orders and injunctive relief to restrain and enjoin violations or threatened violations of this chapter.
>
> (b) Any person may maintain an action in the trial court having jurisdiction where the alleged violation occurred or is likely to occur for restraining orders or injunctive relief against the State, its political subdivisions, or any person upon a showing of irreparable injury, for the protection of an historic property or a burial site and the public trust therein from unauthorized or improper demolition, alteration, or transfer of the property or burial site.

17. At the time the complaint was filed, HRS § 603–21.5 (1993) provided, in pertinent part:

> **General.** The several circuit courts shall have jurisdiction, except as otherwise expressly provided by statute, of:
>
> . . . .
>
> (3) Civil actions and proceedings, in addition to those listed in sections 603–21.6, 603–21.7, and 603–21.8.

18. HRS § 603–21.7(b) (1993) currently provides, as it did when the complaint in this case was filed, in relevant part, as follows:

> **Nonjury cases.** The several circuit courts shall have jurisdiction, without the interven-

tion of a jury except as provided by statute, as follows:

> . . . .
>
> (b) Of actions or proceedings in or in the nature of habeas corpus, prohibition, mandamus, quo warranto, and all other proceedings in or in the nature of applications for writs directed to courts of inferior jurisdiction, to corporations and individuals, as may be necessary to the furtherance of justice and the regular execution of law.

19. HRS § 632–1 (1993) currently provides, as it did when the underlying complaint was filed, in relevant part, as follows:

> **Jurisdiction; controversies subject to.** In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for; provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes, or in any case where a divorce or annulment of marriage is sought. Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations, may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.
>
> Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or

tion."[20]   (Footnotes added.)

On June 25, 1997, Plaintiffs filed a fourteen-count Amended Complaint against Defendants. The fourteen counts alleged, in summary, the following claims:

Count I—The Project violates Hawaii Revised Statutes (HRS) chapter 205, the state land use law;

Count II—An order should be issued directing Mayor Lingle and Maui County to enforce a declaratory ruling by the State of Hawai'i Land Use Commission (LUC) that overnight campgrounds are not permitted uses on agricultural lands rated C, D, E or U; prohibiting Maui Defendants from issuing required county grading and building permits to MR; and prohibiting MR from operating the Project;

Count III—The Project violates HRS chapter 6E requirements regarding historic properties and burial sites;

Count IV—The Project violates the HRS chapter 343 requirement that an environmental assessment be prepared prior to the issuance of any permits or approvals for the Project;

Count V—The Project violates Maui County Code § 20.08.040, which prohibits the grading or grubbing of land without a grading or grubbing permit;

Count VI—The Project violates Article I of the Comprehensive Zoning Ordinance of the County of Maui, which does not permit overnight campgrounds on the lands to be used for the Project;

Count VII—The Project violates a Moloka'i Planning Commission rule that prohibits commercial open area recreational uses in agricultural districts and a Maui County ordinance that prohibits commercial, recreational facilities in agricultural districts;

Count VIII—The Project is inconsistent with the objectives and policies in the Moloka'i Community Plan (MCP);

Count IX—MR failed to obtain required building permits and certificates of occupancy for the "tent" structures located within various campgrounds of the Project;

Count X—MR failed to apply for and receive a variance from the Uniform Fire Code for the "tent" structures, platforms, and bathrooms located within the various campgrounds of the Project;

Count XI—MR failed to apply for and receive variances from the Uniform Building Code for the "tent" structures, platforms, and bathrooms located within the various campgrounds of the Project;

Count XII—Maui Defendants violated Article XII, Section 7 of the Hawai'i Constitution by failing to consider the effects of Project operations on: traditional and customary practices and rights of Hawaiians (e.g., hunting, gathering, fishing, and religious practices); and historic and cultural resources of the area;

Count XIII—Maui Defendants' issuance of permits to MR without holding hearings and giving notice of MR's intended land uses is consistent with the land use regula-

where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. Where, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed; but the mere fact that an actual or threatened controversy is susceptible of relief through a general common law remedy, a remedy equitable in nature, or an extraordinary

legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment in any case where the other essentials to such relief are present.

**20.** Article XI, section 9 of the Hawai'i Constitution states:

### ENVIRONMENTAL RIGHTS

**Section 9.** Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

tion system established by county and state laws and violates due process;

Count XIV—Defendants are liable to Plaintiffs for attorney's fees and costs.

Plaintiffs prayed, in summary, that the circuit court:

(1) Assume jurisdiction over this action;

(2) Enter a declaratory judgment that construction of overnight camp sites for the [Project] pursuant to building permits issued by [Maui County] is in violation of [particular] rules, ordinances, statutes, and constitutional provisions[;]

(3) Issue an order (a) vacating the building permits issued by [Maui County] for [the Project], (b) prohibiting [MR] from implementing or operating [the Project;] and (c) prohibiting [Maui County] from issuing building permits for [the Project] until and unless Defendants comply with [particular] rules, ordinances, statutes, and constitutional provisions . . . [;]

(4) Issue an order (a) directing [Maui County] to enforce the LUC's declaratory order or . . . ruling by prohibiting [Maui County] from issuing required county grading and building permits and [MR] from operating [the Project] because it is not a permitted use on agricultural lands rated C, D, E, or U as determined by the LUC[;]

(6) [sic] Issue an order enjoining Defendants from taking any actions inconsistent with the [circuit court's decision];

(7) [sic] Award Plaintiffs fees and costs, including reasonable attorneys' fees, pursuant to various statutes and the common law; and

(8) [sic] Grant Plaintiffs such other and further relief in law and equity as may be deemed appropriate, including any necessary preliminary relief to preserve Plaintiffs' rights.

On July 30, 1997, the circuit court,[21] upon MR's motion, entered an order dismissing Counts I and II of the Amended Complaint, apparently on the basis that the two claims were compulsory counterclaims that could, and should, be brought in Civil No. 97–0258, MR's appeal from the LUC's Declaratory

Order. Subsequently, pursuant to an order entered on October 22, 1997, the circuit court clarified that the dismissal of Counts I and II of the Amended Complaint was without prejudice. The circuit court's order voiding the LUC's Declaratory Order was filed thereafter.

On June 2, 1998, the parties stipulated to the reinstatement of an amended Count I to the Amended Complaint (Stipulated Count I). The Stipulated Count I, which alleged a claim for violation of HRS chapter 205 against MR only and dropped all previous references to Maui Defendants, alleged as follows:

### Count I: Violation of Chapter 205, [HRS]

44. [MR] proposes to construct and operate, and has begun construction of, various facilities connected with "The Great Molokai Ranch Trail" Project (hereinafter the "Project") on lands located on the West End of the Island of Moloka'i.

45. The Project is to be constructed and operated on lands designated agricultural by the State [LUC] pursuant to Chapter 205, [HRS], and having a soil classification rating of C, D, E, or U, which are located within the County of Maui and the Circuit Court of the Second Circuit, State of Hawai'i.

46. The Project contains facilities intended to be used primarily by tourists and has been marketed for primary use by tourists.

47. The [MCP] contains many objectives and policies which require that all facilities for tourists on the West End of Moloka'i be limited to the Kaluakoi Resort area and that facilities for tourists not be located in areas that would adversely affect traditional and customary uses by the residents of Moloka'i.

48. The Project is not incorporated in the [MCP] and has not been properly reviewed by the County agencies in charge of updating that Plan.

---

21. The Honorable Joseph E. Cardoza presided.

49. The Project involves, among other things, the construction and operation of overnight campgrounds, tent platform structures, dining facilities, roadways, and associated land uses which are of a nature, scope, and intensity that the Project cannot reasonably be considered to be an "overnight campground" or a facility for "open area recreational uses" within the meaning of Chapter 205, [HRS], and is instead more akin to an urban resort operation.

50. [MR] intends to charge fees for the use of facilities which are part of the Project.

51. Pursuant to HRS § 205–2, "[a]gricultural districts shall include activities or uses as characterized by ... open area recreational facilities, including golf courses and driving ranges; provided that they are not located within agricultural district lands with soil classified ... as overall (master) productivity rating class A or B."

52. Under HRS § 205–4.5(c), class C, D, E, or U lands within agricultural districts "shall be restricted to the uses permitted for agricultural districts as set forth in section 205–5(b)."

53. Pursuant to HRS § 205–5(b), "[w]ithin agricultural districts, uses compatible to the activities described in section 205–2, as determined by the commission shall be permitted; provided that accessory agricultural uses and services described in sections 205–2 and 205–4.5 may be further defined by each county by zoning ordinance. Other uses may be allowed by special permits issued pursuant to this chapter."

54. The county's authority to define permissible uses in agricultural districts under HRS § 205–5(b) is limited to "accessory agricultural uses and services" as described in (a) section 205–2—i.e., "bona fide agricultural services and uses which support the agricultural activities of the fee or leasehold owner of the property and accessory to any of the above activities ... including, but not limited to farm dwellings ... employee housing, farm buildings, mills, storage facilities, process facilities, vehicle and equipment storage areas, and roadside stands for the sale of products grown on the premises"—and (b) section 205–4.5(a), which applies to class A or B lands rather than lands classified C, D, E, or U.

55. [MR] violated HRS Chapter 205 by failing to apply for a special use permit or district boundary amendment from the LUC for the Project.

56. Therefore, [Plaintiffs] are entitled to a declaratory judgment that [MR] resort operations associated with the Project, though disguised as "open area recreational facilities," are prohibited on its class C, D, E, or U agricultural lands unless and until Defendant [MR] applies for and receives a special use permit or boundary amendment pursuant to Chapter 205.

57. [MR] has no vested right to proceed with construction and operation of the Project.

(Ellipses in original.)

On August 14, 1998, shortly after Plaintiffs reinstated their chapter 205 claim in the instant action, MR filed seven substantive motions that sought to dispose of the various counts alleged in Plaintiffs' Amended Complaint. Of relevance to this appeal are MR's Motions No. 2, 4, and 6.

In Motion No. 2, MR sought partial summary judgment as to Count VIII, the MCP claim, on grounds that "the present use of land is controlled by the applicable zoning laws, not the provisions of any general or community plan."

In Motion No. 4, MR sought to dismiss Count I, the chapter 205 claim, for lack of subject-matter jurisdiction. MR argued that jurisdiction to enforce HRS chapter 205 is vested in "Maui's zoning enforcement arm." MR further argued that

[u]nder the Home Rule provisions of the State Constitution and by Charter adopted by its voters, [MAUI COUNTY] has, in turn, like the other counties, tied its zoning enforcement responsibilities into initial and appellate branches. Initial zoning enforcement decisions are made by DPW and [its] Director. Persons aggrieved by these initial zoning enforcement determinations may have them reviewed by [MAUI

COUNTY's] Board of Variances and Appeals ("BVA"). Then, and only then, has [MAUI COUNTY] completed its zoning enforcement jurisdiction. Persons still not satisfied with [MAUI COUNTY's] zoning enforcement decisions may then seek judicial review.

Although disagreeing with DPW's Chapter 205 zoning enforcement decision, RITTE did not appeal to the Charter-mandated review agency, the BVA. RITTE'S failure to do so deprives the Court of subject matter jurisdiction over Count I under the doctrines of exhaustion of administrative remedies and primary jurisdiction.

On September 15, 1998, Plaintiffs filed a memorandum in opposition to Motion No. 4. Plaintiffs argued that the circuit court had jurisdiction to address Count I because:

(1) [t]he December 1995 Jencks Letter was not a "decision or order" of Jencks or the [DPW] within the meaning of § 8–5.4(2) of the Maui County Charter; and

(2) even if the December 1995 Jencks Letter was a "decision and order" appealable under § 8–5.4(2) to the [BVA], Plaintiffs had no notice of the existence of the December 1995 Jencks Letter until long after the applicable deadline for taking an appeal to the BVA and thus no administrative remedy was available to [Pono], relieving them of the obligation to exhaust this non-existent remedy.

Plaintiffs agreed that Maui County and its officials have the responsibility to enforce the provisions of HRS chapter 205. Their objection, Plaintiffs said, was to Jencks's "abdication of this responsibility by failing to enforce [the provisions of] [c]hapter 205, as was [Jencks's] duty." Furthermore, Plaintiffs argued, there is nothing in the statutes or any other authority that gives "any support to a claim that the County's enforcement authority is *exclusive* or that private plaintiffs lack a private right of action to enforce [c]hapter 205[.]" (Emphasis in original.)

In Motion No. 6, MR sought partial summary judgment that Count I of the Amended Complaint should be dismissed on grounds that Jencks's conclusion that the Project was permissible under HRS chapter 205 was correct as a matter of law.

A special master [22] was subsequently appointed to conduct a hearing on all pending motions and to submit to the circuit court, within thirty days of conducting a hearing on any motion, a report on the special master's findings and recommendations for disposition of the motion, along with a proposed order thereon.

On May 11, 1999, the special master filed in the circuit court two reports that included his recommendations regarding MR's motions. As to the MCP claim, the special master concluded, in pertinent part, that

I have found, as a matter of law, that the [MCP] provides no basis for relief to [Plaintiffs]. If [Plaintiffs have] a claim based upon zoning, such claims are based on the interim zoning ordinance. There is no dispute of fact that, at all relevant times, the property was not zoned agricultural. The court has ruled there are issues of fact regarding both the validity of the interim zoning ordinance and [MR's] vested rights concerning the Project.... The [MCP] is not a basis upon which claims for relief can be granted to [Plaintiffs]. Zoning controls the use for which property can be applied. This is not the case where the property in question is located within the coastal zone management area. Consequently, *GATRI v. Blane*, 88 Hawai'i 108, 962 P.2d 367[,] is not applicable. Count II[sic] should be dismissed with prejudice.

As to Motion No. 4, which claimed that the circuit court had no jurisdiction to decide Plaintiffs' chapter 205 claim, the special master recommended, in relevant part, as follows:

[MR's] Motion No. 4: Motion to Dismiss Count I (HRS 205)[sic] for Lack of Subject Matter Jurisdiction is predicated upon Plaintiffs' failure to appeal "decisions" of Maui's Director ("Director") of Department of Public Works ("DPW") to Maui's Board of Variance Appeals ("BVA"). The parties focus on two types of "decisions":

22. E. John McConnell was appointed as the special master.

1. A December 11, 1995 letter of the Director to [MR], a copy of which is attached to the motion papers; and

2. The issuance of approximately 100 building permits by DPW for tent platforms for overnight camps on such C, D, E or U lands.

It is undisputed that: (i) Plaintiffs never appealed any of these "decisions" to the BVA; (ii) did not institute this action until May 19, 1997, three and one-half months after the issuance of the last building permit on February 3, 1997; and (iii) [Maui County] adopted a 30–day period for appeals to the BVA on or about November 25, 1996.

I am of the opinion that as a matter of law, the Director's letter of December 11, 1995 contains insufficient detail necessary to establish what was permitted. Further, the letter is an equivocal statement based on the "ideas" of the Ranch. It concludes:

"In summary, the department *feels* the *ideas* proposed by [MR] for the camping program are acceptable for lands rated C, D, E, and U and furthermore *feels* that the charging for use of the proposed activities is also permitted." (emphasis added) [sic]

Therefore, I do not believe the December 11, 1995 letter constitutes an appealable "decision". There remains, however, a question as to whether the issuance and/or failure to appeal the issue of building permits cuts off [Pono's] right, if any, to seek judicial declaratory relief, their remedy instead being an administrative appeal following the creation of a record by the BVA.

Based upon the Hawaii Supreme Court's holding in *Kona Old Hawaiian Trials [sic] v. Lyman,* 69 Haw. [81]89[, 734 P.2d 161] (1987), I recommend that [MR's] Motion No. 4: Motion to Dismiss Count I (HRS 205)[sic] for Lack of Subject Matter Jurisdiction be granted.

I cannot distinguish the *Kona Old* case from the facts underlying [Plaintiffs'] jurisdictional argument. Both cases involve: (1) a request for declaratory relief based on allegations that the director of a county violated a state statute, i.e., for [Plaintiffs] HRS 205–2(d) [sic]; in *Kona Old* HRS 205A–6 [sic]; and (2) in each case the claimant had an opportunity under County Charter for administrative relief, i.e., section 5–6.3 of the Charter of the County of Hawaii (appeals from actions of the Planning Director and the Planning Commission); for [Plaintiffs] Charter of the County of Maui section 8–5.4(2)(1988) ("appeals alleging error from any person aggrieved by decision or order of any department charged with the enforcement of zoning, subdivision and building ordinances").[2] *Kona Old* holds that judicial relief is not available unless the party affected has taken advantage of the procedures provided for in the administrative process.

While I am troubled that there was no formal notice to [Plaintiffs] on the granting of the building permits, *Kona Old,* to me, stands for the proposition that such notice is not required.[3] *Kona Old* relates that as long as the claimant has the opportunity for relief in the administrative process, the court cannot take jurisdiction under the doctrine of primary jurisdiction. Simply put, when an administrative appeal agency is designed for this purpose, the proper initial appeal forum is the administrative one. Although I am concerned that there may not be any relief available when claimants do not monitor the issuance of building permits,[4] I believe that a trial court must adhere to the dictates of our Supreme Court [sic]. As stated by the Supreme Court [sic]:

"Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, has been placed within the special competence of an administrative body ... (citations omitted) [sic] When this happens, 'judicial process is suspended pending referral of such issues to the administrative body for its views.' (citation omitted) [sic] In effect, 'the courts are divested of whatever original jurisdiction they would otherwise possess' (citation omitted) [sic] and 'even a seemingly contrary statutory po-

sition will yield to the overriding policy promoted by the doctrine.' "

*Id.* at 93, 734 P.2d 161.

Therefore, as I believe that *Kona Old* required Plaintiffs in the first instance to have taken their Count I, HRS 205[sic] claim to Maui's BVA, rather than to the Circuit Court, this Court has no subject matter jurisdiction over that claim. As such, I recommend that [MR's] Motion No. 4 be granted and Plaintiffs' Count I be dismissed with prejudice.

---

[2] Maui delegated zoning and building functions to DPW subject to review by BVA. Thus those functions are a two step process in Maui, if someone, such as Plaintiffs, objects.

[3] Although I believe that actual notice is not required to trigger administrative review, it would continue to be relevant to the doctrine of laches. As stated in *Swire Properties (Hawaii), Ltd. v. Zoning Board of Appeals*, [73] Haw. 1[, 826 P.2d 876] (1992), note 4:

"However, we caution future litigants that 'since proceedings for declaratory relief have much in common with equitable proceedings, the equitable doctrine of laches has been applied in such proceedings.' (citations omitted)(equity aids the vigilant)"[.]

[4] This concern, however, relates more to timing than forum selection. The issue of timing should not trigger forum changes. Otherwise an extended appeal period would be obtainable simply by ignoring the initial appeal forum.

(Ellipses in original.)

As to MR's Motion No. 6 regarding the merits of Plaintiffs' chapter 205 claim, the special master recommended as follows:

[I]n the event that the Court declines to follow my recommendation on [MR's] Motion No. 4, I recommend that both motions be denied. [Plaintiffs have] argued that [MR's] Project violates HRS 205[sic] in that the Project is not permissible under HRS 205–2[sic] and HRS 205–4.5[sic] and consequently a special use permit must be obtained for the Project. [MR] has maintained that the Project is permissible under HRS 205–2(d) [sic] and a special use permit is not necessary for the Project.

I agree with [MR] that HRS 205–2(d) [sic] authorizes "open area recreational facilities" as permissible uses within the ag-

ricultural district land classified by the Land Study Bureau's Detailed Land Classification as overall (Master) productivity rating class of C, D, E, and U. It is agreed by the parties that the property in question is classified with a productivity rating of either C, D, E, and U. I agree with [MR] that there is nothing in Hawaii Revised Statutes or the [LUC] Rules and Regulations which prohibits "overnight camps" as a use in land classified C, D, E, and U. Consequently, overnight camps may be a permissible use in such classified land. However, the question as to whether [MR's] Project constitutes "open area recreational facilities" and/or "overnight camps" permissible under HRS 205–2(3)[sic] involves issues of fact which must be resolved at trial.

With regard to [MR's] Motion No. 6 (Count I) and [Plaintiffs'] Motion for Summary Judgment on HRS Section 205, there are genuine issues as to material facts and neither [MR], nor [Plaintiffs] are entitled to judgment as a matter of law."

On January 12, 2000, Plaintiffs filed their "Motion for Partial Summary Judgment No. 1: Requesting that the Court Reject the Master's Recommended Conclusion that the Court Lacks Subject Matter Jurisdiction over [Plaintiffs'] Claims Regarding Violation of H.R.S. Chapter 205."

On April 28, 2000, the circuit court filed its Order granting MR's Motions No. 1, 2, 3, 4, and 7; denying MR's Motion No. 5; identifying as moot, without prejudice, MR's Motion No. 6; and denying Plaintiffs' Motion for Partial Summary Judgment No. 1. In the April 28, 2000 Order, the circuit court adopted all of the special master's recommendations, but expressly rejected the special master's conclusion that the December 11, 2005 letter from Jencks to MR was not a "decision":

With respect to the December 11, 1995 letter, the Court declines to adopt the Spe-

cial Master's report and recommendation concerning that letter (found at page 6 of the Report and Recommendation Re Motion Nos. 1, 3, 4 and 5), and instead the Court finds and concludes that the December 11, 1995 letter, in which Director Charles Jencks states that (a) overnight camping on land rated C, D, E or U is permitted and (b) the charging for the use of such facilities is permitted, constitutes an appealable decision. Specifically, the Court declines to adopt and therefore deletes that portion of the Report and Recommendation Re Motion Nos. 1, 3, 4 and 5 commencing on page 6 which states: "I am of the opinion that as a matter of law, the Director's letter of December 11, 1995 contains insufficient detail necessary to establish what was permitted. Further the letter is an equivocal statement based on 'ideas' of the Ranch. It concludes: 'In summary, the department *feels* the *ideas* proposed by [MR] for the camping program are acceptable for lands rated C, D, E, and U and furthermore *feels* that the charging for use of the proposed activities is also permitted.' (Emphasis added). Therefore, I do not believe the December 11, 1995 letter constitutes an appealable 'decision.' There remains, however, a question as to whether the issuance and/or failure to appeal the issue of building permits cuts off Plaintiffs' right, if any, to seek judicial declaratory relief, their remedy instead being an administrative appeal following the creation of a record by the BVA." The Court replaces this deleted portion of the Report and Recommendation Re Motion Nos. 1, 3, 4 and 5 with the following: "I am of the opinion that as a matter of law, the Director's letter of December 11, 1995 constitutes an appealable 'decision'.["] As the Court explained at the hearing on February 15, 2000 (a copy of the pertinent portion of the transcript is attached hereto as Exhibit 'A' and incorporated herein by reference), this letter from Charles Jencks, Director of Public Works and Waster [sic] Management, to Mr. Fernandez, begins with the subject 'Molokai Ranch Proposed Camping Facilities.' The letter then describes the three types of camping facilities proposed and the uses thereof. The letter states 'the development of camping sites as well as the operation of a camp program as proposed by [MR], is permitted'. The letter further states 'With regard to the issue of charging for the camping facilities, it is also the opinion of this department that ... the issue of charging for the use of these facilities is allowed.' There is no question in the Court's mind that the letter is in fact a conclusion of a determination that is reached and that the same amounts to a decision. Therefore, the Court considers the December 11, 1995 letter to constitute an appealable issue. There remains, also a question as to whether the issuance and/or failure to appeal the issue of the building permits cuts off Plaintiffs' right, if any, to seek judicial declaratory relief, their remedy instead being an administrative appeal following the creation of a record by the BVA."

(Emphases and ellipsis in original.)

On December 14, 2006, the circuit court entered an Amended Final Judgment resolving all the counts of Plaintiffs' Amended Complaint.[23] The Amended Final Judgment was certified as final for appeal purposes pursuant to HRCP Rule 54(b), and this appeal followed.

## DISCUSSION

I. *Plaintiffs Did Not Have Authority to Enforce Chapter 205 Against MR and, Therefore, Lacked Standing to Invoke the Circuit Court's Jurisdiction to Determine Plaintiffs' Chapter 205 Claim.*

A.

█ Relying on *Kona Old,* the circuit court held that it lacked jurisdiction over Plaintiffs' chapter 205 claim because Plaintiffs failed, in the first instance, to appeal their chapter 205 claim to Maui's BVA. The circuit court also concluded that Jencks's December 11, 1995 opinion letter to MR and the DPW's issuance of building permits to MR constituted decisions that were appealable to

---

23. As noted earlier, the Amended Final Judgment

did not resolve MR's counterclaims.

the BVA pursuant to Charter of the County of Maui (CCM) § 8–5.4(2) (1993).

*Kona Old* is the seminal case in Hawai'i regarding the doctrines of exhaustion and primary jurisdiction. In that case, Lanihau Corporation (Lanihau) sought to develop two parcels of land in a shoreline area on the island of Hawai'i that were subject to special controls under the Coastal Zone Management Act (CZMA), HRS chapter 205A. Accordingly, Lanihau submitted an application to the Hawai'i County Planning Department (HCPD) for a special management area (SMA) use permit assessment. *Kona Old,* 69 Haw. at 84–85, 734 P.2d at 163–64. After the HCPD director had issued an SMA minor-use permit to Lanihau, Kona Old, "an association of Kona residents formed to protect and preserve the ancient trails and access routes along the Kona Coast," *id.* at 85, 734 P.2d at 164 (internal quotation marks omitted), filed a complaint with the circuit court to challenge the director's action on various grounds, invoking jurisdiction pursuant to HRS §§ 91–14(a) (1985),[24] 205A–6 (1985)[25] and 603–21.[26] *Id.* at 85 n. 4, 734 P.2d at 164 n. 4. The circuit court dismissed Kona Old's suit on jurisdictional grounds, and Kona Old appealed. *Id.* at 84, 734 P.2d at 163. At the time, County of Hawaii Charter (CHC) § 5–6.3 provided:

> **Board of Appeals.** The board of appeals shall consist of seven members who shall be appointed by the mayor and confirmed by the council in the manner prescribed in Section 13–4. *The board shall hear and determine all appeals from the actions of the planning director and planning commission.* In addition, the board shall hear and determine appeals from the actions of the chief engineer or his staff regarding the enforcement of the building, plumbing, and electrical code and laws.
>
> *All hearings shall be conducted according to the State Administrative Procedures Act.* Whenever possible, persons with a background or expertise in broad areas of planning and construction shall be given preference for appointment to the board, although such background or expertise is not a prerequisite for membership.
>
> *The board shall be part of the planning department for administrative purposes* and the said department shall provide necessary clerical and other assistance.

*Kona Old,* 69 Haw. at 91 n. 11, 734 P.2d at 167 n. 11 (quoting CHC § 5–6.3 (1980)) (emphases in original). The supreme court held that under the foregoing charter provision, the board of appeals had jurisdiction to consider challenges to the HCPD director's issuance of an SMA minor-use permit to Lanihau and Kona Old's failure to exhaust this remedy precluded it from invoking the circuit court's jurisdiction pursuant to HRS § 91–14. *Kona Old* at 94, 734 P.2d at 169.

24. HRS § 91–14 (1985), which has not been amended, provided, in pertinent part:

> **Judicial review of contested cases.** (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law.

25. HRS § 205A–6 (1985) provided, in pertinent part:

> **Cause of action.** (a) Subject to chapters 661 and 662, any person or agency may commence a civil action alleging that any agency:
> (1) Is not in compliance with one or more of the objectives, policies, and guidelines provided or authorized by this chapter within the special management area and the waters from the shoreline to the seaward limit of the State's jurisdiction; or
> (2) Has failed to perform any act or duty required to be performed under this chapter; or
> (3) In exercising any duty required to be performed under this chapter, has not complied with the provisions of this chapter.

26. The supreme court noted in *Kona Old* that HRS § 603–21, "which defined the jurisdiction of the circuit courts, was repealed in 1972. The relevant jurisdictional provisions are now found in HRS §§ 603–21.5, 603–21.6, 603–21.7, and 603–21.8." 69 Haw. 81, 85 n. 4, 734 P.2d 161, 164 n. 4 (1987). In light of the repeal of HRS § 603–21, the appellant in *Kona Old* apparently did not argue the circuit court's jurisdiction pursuant to HRS § 603–21, and the supreme court did not expressly analyze whether the circuit court had jurisdiction pursuant to HRS §§ 603–21.5 and 603–21.7, two statutory provisions invoked by Plaintiffs to assert jurisdiction in this case.

The supreme court then addressed whether Kona Old's "invocation of HRS § 205A–6, which allows 'any person or agency [to] commence a civil action alleging that any agency' has breached the CZMA in some respect, vested the circuit court with jurisdiction over the dispute involving the director's grant of a minor permit to Lanihau." 69 Haw. at 92, 734 P.2d at 168 (alteration in original).

The supreme court noted that courts have developed two principal doctrines, primary jurisdiction and exhaustion of administrative remedies, to "enable the question of timing of requests for judicial intervention in the administrative process to be answered[.]" 69 Haw. at 92–93, 734 P.2d at 168 (brackets omitted). Both of these doctrines, the supreme court said, "are essentially doctrines of comity between courts and agencies." *Id.* at 93, 734 P.2d at 168. The supreme court explained the two doctrines as follows:

> Primary jurisdiction applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. When this happens, the judicial process is suspended pending referral of such issues to the administrative body for its views. In effect, the courts are divested of whatever original jurisdiction they would otherwise possess. And even a seemingly contrary statutory provision will yield to the overriding policy provided by the doctrine.
>
> Exhaustion, on the other hand, comes into play where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. The exhaustion principle asks simply that the avenues of relief nearest and simplest should be pursued first. Judicial review of agency action will not be available unless the party affected has taken advantage of all the corrective procedures provided for in the administrative process. Under this principle, Kona Old clearly had no right to seek judicial review.

*Id.* at 93, 734 P.2d at 168–69 (internal quotation marks, ellipses, brackets, and citations

omitted). Applying these doctrines, the supreme court observed:

> Yet in a strict sense, HRS § 205A–6 was not meant to afford judicial review as such. It affords an interested party an alternative remedy for an agency's noncompliance with the CZMA by authorizing a civil action in which a circuit court "shall have jurisdiction to provide any relief as may be appropriate." HRS § 205A–6(c). The cause of action created thereby seemingly describes a claim "originally cognizable in the courts." *United States v. Western Pac. R. R.*, 352 U.S. [59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)].
>
> Kona Old's claim, however, . . . requires the resolution of issues which, under the regulatory scheme, have been placed within the special competence of the [HCPD]. *Id.* Thus, the request for judicial intervention in the administrative process should not have preceded the resolution by the Board of Appeals of the question of whether the [HCPD] director's action in issuing the minor permit was proper. For it is now firmly established, that *in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by the legislature for regulating the subject matter should not be passed over.* This is so even though the facts after they have been apprised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Id.* at 93–94, 734 P.2d at 169 (quoting *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 96 L.Ed. 576 (1952)) (emphasis added; citations, internal quotation marks, and brackets omitted).

Thus, the supreme court acknowledged that under HRS § 205A–6, the circuit court had original jurisdiction to consider a claim involving an agency's noncompliance with the CZMA and to "provide any relief as may be appropriate." *Kona Old,* 69 Haw. at 93, 734 P.2d at 169 (quoting HRS § 205A–6(c)). However, noting that the HCPD had "special competence" to resolve CZMA regulatory issues and to decide, in the first instance, "cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion," the supreme court applied the primary jurisdiction doctrine and affirmed the circuit court's dismissal of the case. *Id.* at 94, 734 P.2d at 169.

### B.

On appeal, Appellants argue, with respect to the circuit court's dismissal of their chapter 205 claim on exhaustion and primary jurisdictional grounds, as follows:

The issue before the circuit court was whether [MR] violated a *state* law, HRS Chapter 205.

The circuit court decided that Plaintiffs were obligated to appear before the Maui *County* [BVA] to argue whether [MR] violated a *state* law. The circuit court— adopting the reasons set forth in the special master's report—held that Plaintiffs were required to exhaust their administrative remedies under the doctrine of primary jurisdiction pursuant to *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 734 P.2d 161 (1987).

In *Kona Old,* the Hawai'i Supreme Court held that a party cannot seek judicial review without first taking advantage of available internal administrative appeals procedures (i.e. exhaustion). The court also held that a party cannot challenge the agency's conduct without first taking advantage of administrative procedures where resolution of the issue requires an agency's special competence and expertise (i.e. primary jurisdiction). On the other hand, the primary jurisdiction doctrine "does not apply where a pure question of law is at issue and technical matters calling for the special competence of the adminis-

trative expert are not involved." *Aged Hawaiians v. Hawaiian Homes Comm'n,* 78 Hawai'i 192, 202, 891 P.2d 279, 289 (1995).

The circuit court's decision is incorrect for several reasons. **First it assumes that Plaintiffs' primary complaint is with decisions made by Maui County officials rather than the actions of [MR].** Second, it assumes that the Maui County Charter authorizes the [BVA] to resolve disputes concerning the interpretation of a state law. Third, it assumes that a county agency may resolve disputes concerning the interpretation of HRS chapter 205. Fourth, it conflicts with the need for uniformity and consistency in the interpretation of a law of statewide concern. Finally, Plaintiffs brought this very issue to the State [LUC].

(Bolded emphasis added.) Appellants argued that *Kona Old* was inapplicable because they were suing MR, not Maui County Defendants:

When a party sues the government regarding the government's compliance with the law, it is appropriate for the judiciary to consider whether administrative remedies should first be pursued. "Courts have 'developed two principal doctrines to enable the question of timing [of *requests for judicial intervention in the administrative process* ] to be answered: (1) primary jurisdiction; and (2) exhaustion of administrative remedies.'" *Kona Old*[,] 69 Haw. at 92–3, 734 P.2d at 168. These doctrines, however, do not come into play when a private party (1) sues another private party regarding violation of law and (2) does not request judicial intervention in an administrative process.

While Count 1 of Plaintiffs' First Amended Complaint included allegations regarding positions taken by county officials, the gravamen of the count was [MR's] conduct. Count 1 was *not* a request that the court intervene in an administrative process. It was a request that the court declare that [MR's] [P]roject is prohibited until [MR] obtains either a special use permit or a district boundary amendment pursuant to HRS Chapter 205.

Plaintiffs sought a declaratory order from the circuit court pursuant to HRS § 632–1. Count 1 was captioned "Violation of HRS Chapter 205 Requirements." Plaintiffs specifically pled that "Defendant [MR] violated HRS Chapter 205 by failing to apply for a special use permit or district boundary amendment from the LUC for this project." Plaintiffs asked for both declaratory and injunctive relief.

**After being dismissed, Count 1 was reinstated and amended—by stipulation. This revised Count 1 made it even clearer that Plaintiffs sought to enjoin [MR's] activities—not any decision by any county official.** It does not contain any allegations of misconduct by any county official. Instead, **Count 1 is specifically directed at the conduct of [MR]:**

. . . .

[MR] and the Circuit Court inaccurately characterized Plaintiff's [sic] Count 1 as a disagreement with (or an appeal of) a decision of the Maui County Department of Public Works.

(Bolded emphases added; citations and footnote omitted.)

In their Answering Brief, Maui Defendants, seizing on the Opening Brief's acknowledgment that Appellants were not alleging any wrongdoing on the part of Maui Defendants, urged this court to uphold the circuit court's dismissal of Counts I and VIII as to Maui Defendants.

In their Reply Brief to Maui Defendants' Answering Brief, Appellants expressly stated:

While Appellants have vigorously disagreed with the interpretation of the law by prior administrations of Maui County and have challenged the practices of Maui County, Appellants agree with [Maui Defendants] that:

1) Appellants have waived most of their claims by not appealing them (except for Count 1, Count 8 and Count 14, which will be revisited if the circuit court's decision is reversed); and

2) Counts 1 and 8 focuses on the conduct of [MR] and not that of the County.

Given the procedural posture of this appeal, we need not address Appellants' argument that the circuit court misapplied *Kona Old* because we conclude that no private cause of action exists to enforce chapter 205 and therefore, Appellants lacked standing to prosecute their chapter 205 claim against MR and the circuit court lacked subject-matter jurisdiction to consider this claim.

## C.

Appellants invoked HRS § 632–1 in seeking a declaratory order that MR's Project was in violation of HRS chapter 205. The Hawaiʻi Supreme Court has explained that

The declaratory judgment statute, HRS § 632–1, grants courts of record the power to make "binding adjudications of right" in justiciable cases, in three types of civil cases:

■ where an actual controversy exists between contending parties, or [2] where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or [3] where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein.

HRS § 632–1. In each case, the court must be "satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding." *Id.*

*As the declaratory judgment statute thus makes clear, there must be some "right" at issue in order for the court to issue relief.* In *Reliable Collection Agency v. Cole,* [27] 59 Haw. 503, 584 P.2d 107

---

27. In *Reliable Collection Agency, Ltd. v. Cole,* 59 Haw. 503, 584 P.2d 107 (1978), a debt-collection agency sued to collect debts owed by the defendants to two entities, which had assigned the debts to the agency. The defendants counterclaimed for damages and declaratory and injunctive relief, asserting that the agency had engaged in the unauthorized practice of law by virtue of

(1978), this court incorporated the United States Supreme Court's approach from *Cort v. Ash,* [28] 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether "a private remedy is implicit in a statute not expressly providing one"—an analysis that also involves the determination of whether a statute creates a right upon which a plaintiff may seek relief. *Reliable,* 59 Haw. at 507, 584 P.2d at 109 (quoting *Cort*[,] 422 U.S. at 78, 95 S.Ct. 2080). The *Reliable* Court discussed three relevant factors used in *Cort* to make this determination:

> First, is the plaintiff 'one of the class for whose **especial** benefit the statute was enacted[']...—that is, **does the statute create a ... right in favor of the plaintiff?** Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Id.* at 507, 584 P.2d at 109 (first emphasis in original) (quoting *Cort,* 422 U.S. at 78, 95 S.Ct. 2080). Subsequent to *Cort,* decisions of the United States Supreme Court have emphasized that "the key inquiry is whether Congress intended to provide the plaintiff with a private right of action." *Whitey's Boat Cruises, Inc. v. Napali–Kauai Boat Charters, Inc.,* 110 Hawai'i 302, 313 n. 20, 132 P.3d 1213, 1224 n. 20 (2006) (quoting *First Pac. Bancorp, Inc. v. Helfer,* 224 F.3d 1117, 1121–22 (9th Cir. 2000)). Therefore, as we recognized in *Whitey's Boat Cruises,* "we apply *Cort's* first three factors in determining whether a statute provides a private right of action though understanding that legislative intent appears to be the determinative factor." *Id. See also Gonzaga Univ. v. Doe,* 536. U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (For a statute to create private rights, its text must be phrased in terms of the persons benefited.); *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.").

*Rees v. Carlisle,* 113 Hawai'i 446, 458, 153 P.3d 1131, 1143 (2007) (emphases and footnotes added)(bolded emphases in original).

In *Rees,* a taxpayer (Rees) sought declaratory and injunctive relief against Peter Carlisle (Carlisle), the prosecuting attorney for the City and County of Honolulu (City), alleging that Carlisle lacked authority to use public funds and resources to advocate for passage of a proposed constitutional amendment to allow information charging for felony offenses. *Id.* at 448, 153 P.3d at 1133. In addition to requesting a declaratory judg-

its debt collection practices. *Id.* at 504, 584 P.2d at 108.

The Hawai'i Supreme Court held that the statute prohibiting the unauthorized practice of law, which provided for enforcement thereof by "[t]he attorney general or any bar association in this State[,]" did not create a private right of action for damages or for declaratory or injunctive relief in favor of persons who were not the recipients of unlawful legal services. *Id.* at 506, 584 P.2d at 109. Noting that the legislative history of the statute disclosed a legislative purpose to obtain uniformity in enforcement procedures, the supreme court stated that "[t]he legislature could scarcely have also contemplated that enforcement of the prohibition of unauthorized practice of law should be effected by recognizing a private remedy exercisable at the discretion of individuals in the several circuits." *Id.* at 508, 584 P.2d at 110. The supreme court held that "[t]he statutory authorization of the attorney general and any bar association to seek declaratory and injunctive relief in cases of unauthorized practice of law ... should be regarded as exclusive" and not authorizing a right of action in citizens to act as "private attorneys general" and sue "for the injury to the public or social interest" for conduct violating the statute. *Id.* at 509–10, 584 P.2d at 111.

28. *Cort v. Ash* involved a stockholder's action against a corporation and its directors, seeking an injunction and asserting a derivative claim for damages based on alleged violations of a criminal statute prohibiting corporate expenditures on campaigns for federal office, which provided for only a criminal penalty. The United States Supreme Court outlined and applied the factors to be considered in determining whether a statute provides for a private cause of action and held that no private cause of action by a stockholder existed to secure relief for derivative damages based on a violation of the statute. *Cort v. Ash,* 422 U.S. at 78–85, 95 S.Ct. 2080.

ment regarding Carlisle's activity, Rees requested

(1) an injunction ordering Carlisle to compensate the City for (a) all taxpayer resources used to promote passage of the amendment and (b) the portion of the salaries paid to employees of his office for time spent campaigning for passage of the amendment; and (2) an injunction prohibiting Carlisle from campaigning, requesting campaign assistance of city employees, or using taxpayer funds to campaign on ballot questions in the future.

*Id.* at 450, 153 P.3d at 1135. The circuit court granted summary judgment in favor of Carlisle, and Rees appealed. The supreme court initially held that the circuit court wrongly granted summary judgment in favor of Carlisle because neither the Revised Charter of Honolulu nor the state statutes expressly or impliedly authorized Carlisle to use public funds to advocate for a proposed constitutional amendment. *Id.* at 454–56, 153 P.3d at 1139–41. However, the supreme court upheld the circuit court's ruling that no jurisdiction existed to consider Rees's contention that Carlisle's conduct violated Revised Ordinances of Honolulu (ROH) § 3–8.6 (2002), entitled "Additional standards of conduct concerning campaign contributions and campaign assistance." The circuit court held that it lacked jurisdiction because the ordinance "does not appear to create a private right of action in favor of a taxpayer's challenge to the expenditure of public funds." *Id.* at 458, 153 P.3d at 1143 (internal quotation marks omitted).

ROH § 3–8.6 prohibited exempt officers or employees of the City from engaging in certain campaign-related activities, ROH § 3–8.6(c), and provided that "[a]n exempt officer or employee who violates any provision of subsection (c) shall be guilty of a petty misdemeanor" and subject to specified penalties. ROH § 3–8.6(e). The supreme court explained that the ordinance did not authorize Rees to enforce the ordinance against Carlisle:

Nothing in the text of ROH § 3–8.6 appears to create a right protecting members of the public from the activities it prohibits. Rather, it is in the nature of

"standards of conduct" for public officers. Although the public clearly benefits from the existence of such standards, it does not appear that the ordinance was passed for the special benefit of taxpayers as a group. *See Reliable,* 59 Haw. at 507, 584 P.2d at 109 ("First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted[?']" (Quoting *Cort,* 422 U.S. at 78, 95 S.Ct. 2080.)). More importantly, the ordinance clearly states that: "[t]he prosecuting attorney shall be responsible for prosecution of a violation. If the prosecuting attorney becomes disqualified, the state attorney general shall have the responsibility for prosecution." ROH § 3–8.6(e). The ordinance also states that "[t]he penalty of this subsection shall be in addition to the penalty provided under Section 3–8.5(a)," which provides for impeachment and lesser discipline by the appointing authority, upon recommendation of the ethics commission, if the standards of conduct of Article XI of the ROH are violated. ROH § 3–8.5(a). Private enforcement of ROH § 3–8.6 by way of declaratory judgment would not be consistent with the legislative scheme inherent in the ordinance. *See Reliable,* 59 Haw. at 507, 584 P.2d at 109 ("Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" (Quoting *Cort,* 422 U.S. at 78, 95 S.Ct. 2080, 45 L.Ed.2d 26.)).

These considerations make clear that ROH § 3–8.6 does not create a right for taxpayers, like Rees, to enforce; rather, enforcement is mandated through the prosecutor, attorney general, ethics commission, and appointing authority. Therefore, a declaratory judgment that the ordinance was violated is inappropriate, and dismissal of this claim was not erroneous.

*Id.* at 458–59, 153 P.3d at 1143–44. The supreme court thus made clear that in order for a private citizen to seek a declaratory judgment that a statute has been violated, the private citizen must, as a threshold matter, have a private right of action to enforce the statute. *Id.,* 153 P.3d at 1143–44; *see also Waikiki Discount Bazaar, Inc. v. City & County of Honolulu,* 5 Haw.App. 635, 641–42, 706 P.2d 1315, 1319–20 (1985) (holding

that the plaintiffs lacked standing to complain about the issuance of building permits by the City and County of Honolulu (City) to a developer and the City's alleged failure to enforce various Comprehensive Zoning Code (CZC) provisions and Fire Marshal's Rules and Regulations because "no statute provides for enforcement of the CZC or Fire Marshal's Rules and Regulations by an individual; rather, authority for enforcement has been explicitly conferred on specific public officials."); *Hunt v. First Ins. Co. of Hawaii, Ltd.*, 82 Hawaiʻi 363, 371–72, 922 P.2d 976, 986 (1996) (holding that based on a plain reading of HRS chapter 431, article 13 and a review of the chapter's legislative history, no private cause of action exists for persons injured by insurance companies who violate the article); *Whitey's Boat Cruises, Inc. v. Napali–Kauai Boat Charters, Inc.*, 110 Hawaiʻi 302, 314–15, 132 P.3d 1213, 1225–26 (2006) (holding that commercial tour boat operators had no private cause of action against competing tour boat operators and promoters for business torts that were premised on violations of various state and county permitting regulations related to tour boat activities in the Hanalei SMA).

We turn, therefore, to an examination of HRS chapter 205 to determine whether, under the *Rees/Reliable* test, a private right of action exists to enforce the chapter.

###### 1. No Statute Expressly Creates a Private Right to Enforce HRS Chapter 205.

We observe initially that there is no provision in HRS chapter 205 that expressly authorizes a private individual to enforce the chapter. HRS chapter 205 is thus unlike HRS chapter 205A, which was at issue in *Kona Old* and expressly authorizes private civil actions for violations of HRS chapter 205A. Specifically, HRS § 205A–6 (1993) provides:

> **Cause of action.** (a) Subject to chapters 661 and 662, any person or agency may commence a civil action alleging that any agency:
>
> (1) Is not in compliance with one or more of the objectives, policies, and guidelines provided or authorized by

> this chapter within the special management area and the waters from the shoreline to the seaward limit of the State's jurisdiction; or
>
> (2) Has failed to perform any act or duty required to be performed under this chapter; or
>
> (3) In exercising any duty required to be performed under this chapter, has not complied with the provisions of this chapter.
>
> (b) In any action brought under this section, the lead agency, if not a party, may intervene as a matter of right.
>
> (c) A court, in any action brought under this section, shall have jurisdiction to provide any relief as may be appropriate, including a temporary restraining order or preliminary injunction.
>
> (d) Any action brought under this section shall be commenced within sixty days of the act which is the basis of the action.
>
> (e) Nothing in this section shall restrict any right that any person may have to assert any other claim or bring any other action.

HRS § 205A–6 (1993).

A quick survey of the HRS reveals other statutes enacted by the legislature that expressly authorize private causes of actions for violations of state statutes. *See e.g.*, HRS § 128D–21(a)(1) (1993) (authorizing citizen's suits against "[a]ny person, including the State and any other governmental instrumentality or agency, who is alleged to be in violation of any rule, requirement, or order that has become effective pursuant to [HRS chapter 128D, the Environmental Response Law]"); HRS § 342B–56(a)(1) and (3) (1993) (authorizing citizen's suits against "[a]ny person (including the State and the director [of health]) who is alleged to be in violation of [HRS chapter 342B, relating to air pollution control], including any emission standard or limitation or any order issued by the director" and "[a]ny person who proposes to construct or constructs any new or modified major emitting facility without a required permit or who is alleged to be in violation of any condition of such permit"); HRS § 343–7 (1993) (establishing limitation periods for ini-

tiating judicial proceedings to challenge a government agency's decision to approve a proposed action without requiring preparation of an environmental impact statement or an environmental assessment); and HRS § 661–25 (Supp.2007) (authorizing civil actions by private persons for violation of HRS § 661–21 (Supp.2007) relating to false claims made to the State).

It is obvious then that when the legislature desires to provide a private cause of action to Hawai'i's citizens to remedy a statutory violation, it knows how to do so and has done so expressly. It has not done so in the case of HRS chapter 205.

> *2. There is No Indication of Legislative Intent, Explicit or Implicit, to Create a Private Right of Action to Enforce Chapter 205.*

The legislative history of HRS chapter 205 is completely silent on whether the legislature intended to create a private right of action to enforce the chapter. However, the findings and declaration of purpose of Act 187, 1961 Haw. Sess. L. 299, the initial law that is now codified as HRS chapter 205, stated:

> Inadequate controls have caused many of Hawaii's limited and valuable lands to be used for purposes that may have a short-term gain to a few but result in a long-term loss to the income and growth potential of our economy. Inadequate basis for assessing lands according to their value in those uses that can best serve both the well-being of the owner and the well-being of the public have resulted in inequities in the tax burden, contributing to the forcing of land resources into uses that do not best serve the welfare of the State. Scattered subdivisions with expensive, yet reduced, public services; the shifting of prime agricultural lands into nonrevenue producing residential uses when other lands are available that could serve adequately the urban needs; failure to utilize fully multiple-purpose lands; these are evidences of the need for public concern and action.

> Therefore, the Legislature finds that in order to preserve, protect, and encourage the development of the lands in the State

for those uses to which they are best suited for the public welfare and to create a complementary assessment basis according to the contribution of the lands in those uses to which they are best suited, the power to zone should be exercised by the State and the methods of real property assessment should encourage rather than penalize those who would development [sic] these uses.

Act 187 had its genesis in House Bill No. 1279. In its report on the bill, the House Committee on County and Lands stated, in part:

> The purpose of this bill is to protect and conserve through zoning the urban, agricultural and conservation lands within all the counties. A coordinated, balanced approach not only within each county but an overall balance of statewide land needs for economic growth is essential in order to:

> (1) Utilize the land resources in an intelligent, effective manner based upon the capabilities and characteristics of the soil and the needs of the economy;

> (2) Conserve forests, water resources and land, particularly to preserve the prime agricultural lands from unnecessary urbanization;

> (3) Stage the allocation of land for development in an orderly plan to meet actual needs and minimize costs of providing utilities and other public services;

> (4) Encourage completion of partially-developed areas already supplied with public facilities before new lands and new public investments are demanded;

> (5) Plan urban areas so as to avoid overcrowding of residential land and undue concentration of population.

> . . . .

> This bill establishes a State Land Use Commission with seven appointed and two ex-officio members. This Commission is authorized to establish land use regulations for the major classes of urban, agricultural and conservation uses. Use classification maps are to be developed for each island to establish the boundaries of the districts for these uses. Provisions are made for public hearings, adoption, amend-

ment, appeals and periodic five year reviews for these district boundaries and for the regulations on land use.

In the establishment, enforcement and change in these areas and these regulations, existing county planning organizations will be consulted, plans coordinated, and facilities and special knowledge utilized. The powers of the counties to make and change detailed zoning within the major land use areas established by the state will not be changed but should in fact be strengthened by the supporting state power.

The establishment of these major land use districts is an essential step to the implementation of the General Plan and to improving the equitability of real property tax assessment among various land uses and between various counties.

House Stand. Comm. Rep. No. 395, 1961 House Journal at 855–56.

In 1963, the legislature enacted Act 205, which clarified the provisions of Act 187. Section 1 of Act 205 explained the reason for the clarification:

Experience and research to date on the application of the provisions of Act 187, Session Laws of Hawaii 1961, have demonstrated the need for clarifying the provisions of said Act 187 not only with reference to the division of authority between the land use commission and the counties, but also with respect to the hardship caused to land owners who wish to develop lands included in agricultural districts but where such lands are not at all suitable for agricultural uses. The purpose of this Act, therefore, is to clarify the provisions of Act 187, Session Laws of Hawaii 1961, in order to provide for a more effective administration and a more equitable application of the provisions of said Act 187.

Act 205, 1963 Haw. Sess. L. at 315.

There is no indication in the legislative history of any of the acts that were ultimately codified in HRS chapter 205 that the legislature intended to provide private citi-

zens with the right to enforce the land-use provisions of HRS chapter 205. Implying a private right of action on the basis of legislative silence would thus be a "hazardous enterprise, at best." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

> 3. *A Private Right of Action to Enforce HRS Chapter 205 is Not Consistent with the Underlying Purposes of HRS Chapter 205.*

As noted above, the purposes of the land-use-classification system established in HRS chapter 205 are to "preserve, protect, and encourage the development of the lands in the State for those uses to which they are best suited for the public welfare and to create a complementary assessment basis according to the contribution of the lands in those uses to which they are best suited" and to further "a coordinated and balanced approach" to classifying land use within each county and throughout the State.

HRS chapter 205 establishes a two-tiered, land-use-regulatory system in which all land in the State of Hawai'i is classified by the LUC into one of four districts or zones: urban, rural, agricultural, and conservation. HRS § 205–2(a) (1993). Land within an agricultural district is further classified as "A or B" land or "C, D, E, or U" land, according to its soil productivity. HRS § 205–4.5 (Supp.2007).[29] Once lands are classified by the State, the respective counties are empowered to enact zoning ordinances to regulate the use of classified lands within their counties, but *"only* according to the dictates of HRS § 46–4" and "subject to limitations within HRS chapter 205." *Save Sunset Beach Coalition v. Honolulu*, 102 Hawai'i 465, 480, 78 P.3d 1, 16 (2003).

Pursuant to HRS § 205–12 (1993), the legislature has delegated enforcement of the restrictions and conditions relating to land-use-classification districts in a county to the county official charged with administering the zoning laws for that county:

---

**29.** The provisions of HRS § 205–4.5 that relate to the classification of land in agricultural districts according to soil productivity have not ma-

terially changed since the events leading to this lawsuit occurred.

**Enforcement.** The appropriate officer or agency charged with the administration of county zoning laws shall enforce within each county the use classification districts adopted by the land use commission and the restriction on use and the condition relating to agricultural districts under section 205–4.5 and shall report to the commission all violations.

At the time that the events giving rise to the underlying lawsuit took place,[30] MCC chapter 5, which established the Maui County DPW that Jencks headed, provided, in pertinent part, as follows:

**Section 8–5.1 Organization.** There shall be a department of public works and waste management consisting of a director, a board of variance and appeals, and the necessary staff.

**Section 8–5.2. Director of Public Works and Waste Management.** The director of public works and waste management shall be appointed and may be removed by the mayor....

**Section 8–5.3. Powers, Duties, and Functions.** *The director of public works and waste management shall:*

1. *Administer the* building and housing codes, subdivision and *zoning ordinances* and rules adopted thereunder.

2. Approve proposed subdivision plans which are in conformity with the subdivision ordinance.

(Emphases added.) Thus, it was the Director of DPW who was responsible for enforcing HRS chapter 205 in Maui County.

The penalties for violating HRS chapter 205, which the counties may seek in enforcing the chapter, are set forth in HRS § 205–13 (1993):

**Penalty for violation.** Any person who violates any provision under section 205–4.5, or any *regulation* established relating thereto, shall be fined not more than $5,000, and any person who violates any other provision of this chapter, or any reg-

ulation established relating thereto, shall be fined not more than $1,000.

If any person cited for a violation under this chapter fails to remove such violation within six months of such citation and the violation continues to exist, such person shall be subject to a citation for a new and separate violation. There shall be a fine of not more than $5,000 for any additional violation.

Prior to the issuance of any citation for a violation, the appropriate enforcement officer or agency shall notify the violator and the mortgagee, if any, of such violation, and the violator or the mortgagee, if any, shall have not more than sixty days to cure the violation before citation for a violation is issued.

In *Lanai Co. v. Land Use Comm'n,* 105 Hawai'i 296, 97 P.3d 372 (2004), the Hawai'i Supreme Court construed HRS § 205–12 as authorizing the counties, but not the LUC, to enforce chapter 205. In that case, the LUC, after determining that a developer had violated a condition of an LUC order, sought to enforce the condition. *Id.* at 302, 97 P.3d at 378. The supreme court held that although the LUC was authorized to impose conditions "for the purpose of 'upholding the intent and spirit' of HRS chapter 205," *id.* at 318, 97 P.3d at 394 (brackets omitted), it did not have the power to enforce these conditions. The court explained that

[p]ursuant to their enforcement duties under § 205–12, counties have the responsibility to take necessary action against violators.... Thus, looking to the express language of HRS § 205–12, it is clear and unambiguous that enforcement power resides with the appropriate officer or agency charged with the administration of county zoning laws, namely the counties, and not the LUC.

*Id.* The court further proclaimed that "[i]f the legislature intended to grant the LUC enforcement powers, it could have expressly provided the LUC with such power.... By

---

**30.** Pursuant to amendments to the MCC that were ratified by Maui County voters in 2002, the Department of Public Works and Waste Management was changed to the Department of Public Works and Environmental Management and the administration and the function of enforcing zoning ordinances was transferred to the Department of Planning. MCC chapters 5 and 8 (2003 ed.).

omitting any such reference, it is apparent the legislature did not intend to grant such enforcement powers to the LUC." *Id.* at 318–19, 97 P.3d at 394–95.

In light of the supreme court's holding in *Lanai Co.*, it would be incongruous to hold that the legislature intended to grant private citizens a right to enforce the provisions of HRS chapter 205 against violators of the chapter.

## II. *MR's Motion for Partial Summary Judgment on the Chapter 205 Claim*

In Stipulated Count I of their Amended Complaint, Plaintiffs alleged that they were entitled to a declaratory judgment that MR's Project was prohibited on class C, D, E, or U agricultural lands unless and until MR applied for and received a special use permit or boundary amendment pursuant to HRS chapter 205. MR's Motion No. 6 sought partial summary judgment as to this Count I, on grounds that the Project was a permissible use of non-prime-agricultural lands under HRS chapter 205 as a matter of law. The circuit court never reached the merits of MR's motion, however, because after dismissing the chapter 205 claim for lack of jurisdiction, it dismissed the motion as moot.

On appeal, Appellants contend that HRS chapter 205 plainly bars MR's use of non-prime-agricultural land for overnight camping. In light of our conclusion that Appellants did not have a private cause of action to enforce their chapter 205 claim against MR, we need not address this contention.

## III. *No Private Cause of Action Exists to Enforce the MCP Claim.*

In their Amended Complaint, Plaintiffs alleged, with respect to Count VIII, the following:

> *Count VIII: Violation of Requirement for Conformity With Moloka'i Community Plan.*
>
> 129. Under HRS §§ 226–51 and –52, conformance with county development plans, including the [MCP], is required to implement the integrated statewide planning system.
>
> 130. Furthermore, under HRS § 46–4, all counties are required to zone land uses within the framework of a long range, comprehensive general plan consistent with the LUC land use boundaries. These plans are to be formulated with input from state agencies and the general public.
>
> 131. The [Project] is inconsistent with the objectives and policies in the [MCP].
>
> 132. *A community plan amendment was and is required prior to the issuance of any permits for [the Project].*
>
> 133. *Defendants have failed to properly process any amendments to the [MCP] to incorporate the project in the plan.*
>
> 134. Therefore, Plaintiffs are entitled to an order declaring that (a) a community plan amendment was and is required prior to the issuance of any permits for this project, and (b) all permits issued to date for this project are void and that further implementation and operation of the project be prohibited until and unless a community plan amendment is obtained.

(Emphases added).

For the same reasons that we have concluded that no private cause of action exists to enforce HRS chapter 205, we conclude that no private cause of action exists to enforce the MCP. We have been unable to locate any statute, ordinance, charter provision, or rule that explicitly creates a private right of action to enforce the MCP against alleged violators. There is also no indication of intent on the part of the legislature or the Maui County Council to explicitly or implicitly create such a remedy for private citizens. Finally, we are unable to conclude that allowing private causes of action to enforce community plans, such as the MCP, is consistent with the underlying purposes of the legislative scheme for requiring such plans.

In recommending dismissal of Plaintiffs' MCP claim, the special master explained that

> [w]ith regard to [Plaintiffs'] claim that [MR] has violated the [MCP], I have found, as a matter of law, that the [MCP] provides no basis for relief to [Plaintiffs]. If [Plaintiffs have] a claim based upon zoning, such claims are based on the interim zoning ordinance. There is no dispute

of fact that, at all relevant times, the property was not zoned agricultural. The court has ruled there are issues of fact regarding both the validity of the interim zoning ordinance and [MR's] vested rights concerning the Project.... The [MCP] is not a basis upon which claims for relief can be granted to [Plaintiffs]. Zoning controls the use for which property can be applied. This is not the case where the property in question is located within the coastal zone management area. Consequently, *GATRI v. Blane*, 88 Haw. [sic] 108, 962 P.2d 367[,] is not applicable. Count [VIII] should be dismissed with prejudice.

We note parenthetically that the special master was not entirely correct. In the County of Maui, general and community plans may not be disregarded by county officials. For example, Maui County Code (MCC) § 2.80B.030(B) specifically provides:

All agencies shall comply with the general plan. Notwithstanding any other provision, all community plans, zoning ordinances, subdivision ordinances, and administrative actions by agencies shall conform to the general plan. Preparation of County budgets and capital improvement programs shall implement the general plan to the extent practicable. The countywide policy plan, Maui island plan, and community plans authorized in this chapter are and shall be the general plan of the County, as provided by section 8–8.5 of the charter.

Other MCC provisions similarly require county agencies to act in accordance with the general plan, of which the community plan is a part. *See, e.g.,* MCC § 19.04.015(A) ("[t]he purpose and intent of this comprehensive zoning article is to regulate the utilization of land ... in accordance with the land use directives of ... the general plan and the community plans of the County"); MCC § 19.04.015(B)(1) ("[t]he purpose and intent of this comprehensive zoning article is also to promote and protect the health, safety and welfare of the people of the County by ... guiding, controlling and regulating future growth and development in accordance with the general plan and community plans of the County"); MCC § 19.510.040(A)(4)(a) and (b)

("[t]he county council may grant a change of zoning if all of the following criteria are met: ... [t]he proposed request meets the intent of the general plan and the objectives and policies of the community plans of the county" and "[t]he proposed request is consistent with the applicable community plan land use map of the county"). Under the MCC, before the DPW or any other county agency issues a permit, the agency must ensure that the project in question adheres to the specifications of the general plan and community plans of Maui County, including the Moloka'i Community Plan. *Id.*

In their opening and reply briefs, Appellants state quite clearly that their MCP claim focuses on the conduct of MR and not that of Maui Defendants. Since the MCC provisions that require county agencies to comply with the MCP are not applicable to MR, it was not error for the circuit court to dismiss Plaintiffs' MCP claim for failure to state a claim against MR.

## CONCLUSION

In light of the foregoing discussion, we affirm: (1) the circuit court's April 28, 2000 Order; and (2) the December 14, 2006 Amended Final Judgment that resolved Counts I and VIII in favor of Appellees.

Concurring Opinion by FOLEY, J.

I concur.

### I.

Pono argues, for the following reasons, that the circuit court erred in determining that it had no jurisdiction to determine whether Molokai Ranch's "series of luxury tourist accommodations on agricultural land" violated HRS Chapter 205:

(1) The circuit court erroneously assumed that Pono's primary complaint was with decisions made by Maui County officials rather than the actions of Molokai Ranch.

(2) The circuit court erroneously assumed that the Maui County Charter authorized the BVA to resolve disputes concerning the interpretation of a state law.

(3) The circuit court erroneously assumed that a county agency may resolve disputes

concerning the interpretation of HRS Chapter 205.

(4) The circuit court's decision conflicts with the need for uniformity and consistency in the interpretation of a law of statewide concern.

(5) Pono exhausted the administrative remedies available to it by bringing this issue to the LUC.

In the Stipulated Count I, Pono alleged in relevant part that it was entitled to a declaratory judgment that "Molokai Ranch's resort operations associated with the Project, though disguised as 'open area recreational facilities,' are prohibited on its class C, D, E or U agricultural lands unless and until [Molokai Ranch] applies for and receives a special use permit or boundary amendment pursuant to [HRS] Chapter 205."

In its "Order Granting Defendant Molokai Ranch, Ltd.'s Motions No. 1, 2, 3, 4 and 7, Filed August 19, 1998, and Denying Plaintiffs Pono et al.'s Motion for Partial Summary Judgment No. 1, Filed January 12, 2000" (April 28, 2000 Order), the circuit court explained that it granted the motions based, in part, on the reasons set forth in the May 11, 1999 "Special Master's Report and Recommendations to: (1) Grant Molokai Ranch, Ltd.'s Motion[ ] No. 1: Motion for Partial Summary Judgment on Count IV (HRS 343), and Motion No. 3: Motion for Partial Summary Judgment on Count III (HRS 6E); (2) Deny Without Prejudice Molokai Ranch, Ltd.'s Motion No. 5: Motion for Summary Judgment Due to Plaintiffs' Laches; and (3) Granting [sic] Molokai Ranch, Ltd.'s Motion No. 4: Motion to Dismiss Count I (HRS 205) for Lack of Subject Matter Jurisdiction"[1] (Special Master's Report). The Special Master's Report provided in relevant part:

## C. GRANTING, MOLOKAI RANCH'S MOTION NO. 4 DISMISSING PLAINTIFFS' COUNT I (HRS [CHAPTER] 205) FOR LACK OF SUBJECT MATTER JURISDICTION

[Molokai] Ranch's Motion No. 4: Motion to Dismiss Count I (HRS [Chapter] 205)

for Lack of Subject Matter Jurisdiction is predicated upon [Pono's] failure to appeal "decisions" of Maui's Director ("Director") of Department of Public Works ("DPW") to Maui's Board of Variance [and] Appeals ("BVA"). The parties focus on two types of "decisions":

1. A December 11, 1995 letter of the Director to [Molokai] Ranch, a copy of which is attached to the motion papers; and

2. The issuance of approximately 100 building permits by DPW for tent platforms for overnight camps on such C, D, E or U lands.

It is undisputed that: (i) [Pono] never appealed any of these "decisions" to the BVA; (ii) did not institute this action until May 19, 1997, three and one-half months after the issuance of the last building permit on February 3, 1997; and (iii) Maui adopted a 30-day period for appeals to the BVA on or about November 25, 1996.

. . . .

... There remains ... a question as to whether the issuance and/or failure to appeal the issue of building permits cuts off [Pono's] right, if any, to seek judicial declaratory relief, their remedy instead being an administrative appeal following the creation of a record by the BVA.

Based upon the Hawaii Supreme Court's holding in *Kona Old Hawaiian [Trails Group] v. Lyman,* 69 Haw. 81[, 734 P.2d 161] (1987), I recommend that [Molokai] Ranch's Motion No. 4: Motion to Dismiss Count I (HRS [Chapter] 205) for Lack of Subject Matter Jurisdiction be granted.

I cannot distinguish the *Kona Old* case from the facts underlying Pono's jurisdictional argument. Both cases involve: (1) a request for declaratory relief based on allegations that the director of a county agency violated a state statute, i.e., for Pono HRS [§ ]205-2(d); in *Kona Old* HRS [§ ]205A-6; and (2) in each case the claim-

---

1. Also on May 11, 1999, McConnell filed a second special master's report and recommendation concerning Molokai Ranch's motions numbered

2, 6, and 7 and Pono's motion for summary judgment on HRS Chapter 205.

ant had an opportunity under County Charter for administrative relief, i.e., section 5–6.3 of the Charter of the County of Hawaii (appeals from actions of the Planning Director and the Planning Commission); for Pono: Charter of the County of Maui section 8–5.4(2) (1988) ("appeals alleging error from any person aggrieved by decision or order of any department charged with the enforcement of zoning, subdivision and building ordinances"). *Kona Old* holds that judicial relief is not available unless the party affected has taken advantage of the procedures provided for in the administrative process.

While I am troubled that there was no formal notice to Pono on the granting of the building permits, *Kona Old*, to me, stands for the proposition that such notice is not required. *Kona Old* relates that as long as the claimant has the opportunity for relief in the administrative process, the court cannot take jurisdiction under the doctrine of primary jurisdiction. Simply put, when an administrative appeal agency is designed for this purpose, the proper initial appeal forum is the administrative one. Although I am concerned that there may not be any relief available when claimants do not monitor the issuance of building permits, I believe that a trial court must adhere to the dictates of our Supreme Court [sic]. As stated by the Supreme Court [sic]:

> "Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, has been placed within the special competence of an administrative body .... (citations omitted) [sic] When this happens, 'judicial process is suspended pending referral of such issues to the administrative body for its views.' (citation omitted) [sic] In effect, 'the courts are divested of whatever original jurisdiction they would otherwise possess' (citation omitted) and 'even a seemingly contrary statutory position will yield to the overriding policy promoted by the doctrine.'"

[*Kona Old*, 69 Haw. at 93, 734 P.2d at 168–69.]

Therefore, as I believe that *Kona Old* required [Pono] in the first instance to have taken [its] Count I, HRS [Chapter] 205 claim to Maui's BVA, rather than to the Circuit Court, this Court has no subject matter jurisdiction over that claim. As such, I recommend that [Molokai] Ranch's Motion No. 4 be granted and [Pono's] Count I be dismissed with prejudice.

(Footnotes in original omitted.)

In *Kona Old*, Kona Old Hawaiian Trails Group (Kona Old Group), an association of Kona residents formed "to protect and preserve the ancient trails and access routes along the Kona Coast," objected to the issuance of a "special management area minor use permit" by the director of the Hawai'i County Planning Department to Lanihau Corporation, an owner of real property who planned to develop and market the property. 69 Haw. at 83–85, 734 P.2d at 163–64.

Kona Old Group, purporting to invoke the jurisdiction of the Circuit Court of the Third Circuit (third circuit court) pursuant to HRS §§ 91–14 (1985),[2] 205A–6 (1985),[3] and 603–21

---

2. In 1987, HRS § 91–14 (1985) provided in relevant part:

§ 91–14 **Judicial review of contested cases.** (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law.

3. In 1987, HRS § 205A–6 (1985) provided:

§ 205A–6 **Cause of action.** (a) Subject to chapters 661 and 662, any person or agency may commence a civil action alleging that any agency:

(1) Is not in compliance with one or more of the objectives, policies, and guidelines provided or authorized by this chapter within the special management area and the waters from the shoreline to the seaward limit of the State's jurisdiction; or

(2) Has failed to perform any act or duty required to be performed under this chapter; or

(1968),[4] sought judicial review of the director's action, claiming the director had violated the Coastal Zone Management Act (CZMA), breached public trust, and disturbed traditional public easement rights by improvidently granting the permit. 69 Haw. at 83, 86 & 89, 734 P.2d at 163, 164 & 166. Kona Old Group also "averred that mandates of the Hawaii Administrative Procedure Act, HRS [C]hapter 91, had not been observed, since rules governing the issuance of permits had not been promulgated." 69 Haw. at 86, 734 P.2d at 164–65. Kona Old prayed "that the permit be voided and the proposed construction be enjoined." *Id.* at 86, 734 P.2d at 165.

The director moved to dismiss the appeal, arguing, among other things, that Kona Old Group had not "exhausted administrative remedies before seeking judicial review." *Id.* at 86, 734 P.2d at 165. The third circuit court dismissed the appeal. *Id.* Although the third circuit court did not give its reasons for dismissing the appeal, its dismissal was clearly on jurisdictional grounds. *Id.* at 89, 734 P.2d at 166.

Kona Old Group appealed to the Hawai'i Supreme Court, arguing that the third circuit court should not have dismissed its appeal on jurisdictional grounds because HRS § 91–14 gave Kona Old Group the right to seek judicial review of the administrative action. 69 Haw. at 89, 734 P.2d at 166. Kona Old Group argued, alternatively, that HRS § 205A–6 entitled it to invoke judicial intervention in the controversy. 69 Haw. at 89, 734 P.2d at 166–67. The Hawai'i Supreme Court explained the procedural process of contesting the issuance of special management area use permits:

> (3) In exercising any duty required to be performed under this chapter, has not complied with the provisions of this chapter.
> (b) In any action brought under this section, the lead agency, if not a party, may intervene as a matter of right.
> (c) A court, in any action brought under this section, shall have jurisdiction to provide any relief as may be appropriate, including a temporary restraining order or preliminary injunction.

At issue here is the CZMA, a statute embodying "the state policy to preserve, protect, and where possible, to restore the natural resources of the coastal zone of Hawaii." HRS § 205A–21. The task of implementing the policy, however, "has been delegated in large part to the counties, and they are responsible for the administration of the special management area use permit procedure and requirements." *Mahuiki v. Planning Commission,* 65 [Haw.] 506, 517, 654 P.2d 874, 881 (1982). "State primacy nevertheless has been retained," and the legislature has attempted to "maintain the integrity of its declared policy by establishing guidelines in HRS § 205A–26 that must be followed by the counties in reviewing applications for special management area use permits." *[Mahuiki,]* 65 Haw. at 517–18, 654 P.2d at 881–82.

The counties are further compelled to adopt specific procedures consistent with the CZMA for the issuance of "special management area minor permits," and these procedures must provide for "judicial review from the grant and denial thereof." A person aggrieved by a county agency's failure to comply with the Act is accorded a right thereunder to initiate a civil action against the noncomplying agency. Thus, the governing statutory scheme provides two means through which judicial intervention may be sought to enforce the state policy enunciated in HRS [C]hapter 205A. *Id.* at 88–89, 734 P.2d at 166 (brackets in original and footnotes omitted).

The supreme court explained that for Kona Old Group to invoke judicial review under the Administrative Procedure Act, Kona Old Group was required, pursuant to HRS § 91–14, to participate in a contested case hearing

> (d) Any action brought under this section shall be commenced within sixty days of the act which is the basis of the action.
> (e) Nothing in this section shall restrict any right that any person may have to assert any other claim or bring any other action.

4. HRS § 603–21 (Jurisdiction; circuit courts) was repealed in 1972, and in 1987, the relevant jurisdictional provisions were found in HRS §§ 603–21.5 (1985), 603–21.6 (1985), 603–21.7 (1985), and 603–21.8 (1985). *Kona Old,* 69 Haw. at 86 n. 4, 734 P.2d at 165 n. 4.

before an administrative agency prior to appealing to the third circuit court. 69 Haw. at 90, 734 P.2d at 167. The supreme court stated that a "contested case" was defined in HRS § 91-1(5) (1985) as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing" and an "agency hearing" was described by HRS § 91-1(6) (1985) as "such hearing held by an agency immediately prior to a judicial review of a contested case as provided in section 91-14." 69 Haw. at 90, 734 P.2d at 167. The court further stated that, under the County of Hawai'i Planning Commission Rules, Rule 9-10, "the planning director's decision to grant a permit did not need to be preceded by a hearing." 69 Haw. at 90, 734 P.2d at 167. Therefore, the supreme court held, the director's "decision to grant a minor permit could not have been a final decision or order in a contested case from which an appeal to [the third circuit] court was possible." Id. at 90-91, 734 P.2d at 167 (internal quotation marks and citation omitted).

Notwithstanding the lack of a contested case hearing, the supreme court explained, the procedures included in the charter of the County of Hawai'i provided Kona Old Group with "an opportunity for an agency hearing and [met] the statutory demand for specific procedures culminating in judicial review." Id. at 91, 734 P.2d at 167. The charter established a board of appeals that "shall hear and determine all appeals from the actions of the . . . planning commission." Id. at 91 n. 11, 734 P.2d at 167 n. 11 (emphasis omitted). The charter provided for a hearing by the board of appeals "according to the State Administrative Procedures Act," in which the issuance of a minor permit could be contested. Id. at 91, 734 P.2d at 168. The decision of the administrative tribunal would have been appealable to the third circuit court, but since Kona Old Group "did not avail itself of this opportunity for an agency hearing," the supreme court held, there was "no final decision or order in a contested case which is subject to judicial review by virtue of HRS § 91-14(a)." 69 Haw. at 92, 734 P.2d at 168.

The supreme court then turned to "whether Kona Old Group's invocation of HRS § 205A-6, which allows 'any person or agency to commence a civil action alleging that any agency' has breached the CZMA in some respect, vested the circuit court with jurisdiction over the dispute involving the director's grant of a minor permit to Lanihau." 69 Haw. at 92, 734 P.2d at 168 (brackets omitted). The supreme court explained the following with regard to the principles of "primary jurisdiction" and "exhaustion of remedies":

Primary jurisdiction applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. When this happens, the judicial process is suspended pending referral of such issues to the administrative body for its views. In effect, the courts are divested of whatever original jurisdiction they would otherwise possess. And even a seemingly contrary statutory provision will yield to the overriding policy promoted by the doctrine.

Exhaustion on the other hand, comes into play where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. The exhaustion principle asks simply that the avenues of relief nearest and simplest should be pursued first. Judicial review of agency action will not be available unless the party affected has taken advantage of all the corrective procedures provided for in the administrative process.

Id. at 93, 734 P.2d at 168-69 (internal quotation marks, citations, ellipses, and brackets omitted).

The supreme court then held that under the principle of exhaustion of administrative remedies, "Kona Old clearly had no right to seek judicial review." Id. at 93, 734 P.2d at 169. The supreme court noted, however, that HRS § 205A-6,

in a strict sense, . . . was not meant to afford judicial review as such. It affords

an interested party an alternative remedy for an agency's noncompliance with the CZMA by authorizing a civil action in which the circuit court shall have jurisdiction to provide any relief as may be appropriate. The cause of action created thereby seemingly describes a claim originally cognizable in the courts.

69 Haw. at 93, 734 P.2d at 169 (internal quotation marks and citations omitted). Although the supreme court recognized that "[t]aken at face value, [HRS § ]205–6 would sanction judicial intervention in the administrative process upon any allegation of an act inconsistent with the CZMA in any respect[,]" 69 Haw. at 92, 734 P.2d at 168, the supreme court held:

> Kona Old's claim ... involves the issuance of a special management area minor permit, and its enforcement requires the resolution of issues which, under the regulatory scheme, have been placed within the special competence of the county planning department. Thus, the request for judicial intervention in the administrative process should not have preceded the resolution by the Board of Appeals of the question of whether the planning director's action in issuing the minor permit was proper.

*Id.* at 94, 734 P.2d at 169 (internal quotation marks, citation, and brackets omitted).

## II.

Pono contends the circuit court erroneously assumed that Pono's primary complaint was with decisions made by Maui County officials rather than the actions of Molokai Ranch. Pono argues that the concepts of "primary jurisdiction" and "exhaustion of administrative remedies" do not apply in the instant case because Pono, a private party, sued Molokai Ranch, another private party, and Pono did not request judicial intervention in an administrative process. In this regard, Pono maintains that *Kona Old* is not applicable because Pono made it clear in its Stipulated Count I that it challenged the actions of Molokai Ranch, rather than any county official's decision.

In the factual allegations of its Amended Complaint, Pono explained that it disputed the decision of then-Director Jencks and the actions of Lingle and appealed Director Jencks' decision to the LUC. Further, Pono named as defendants Lingle, Jencks, and the County of Maui. Although Pono characterizes its dispute as being primarily with Molokai Ranch, a private party, the record on appeal makes clear that Pono was challenging both the actions of Molokai Ranch and the administrative process by which Molokai Ranch was able to obtain building permits to construct camping accommodations on agricultural land.

## III.

Pono asserts that the circuit court erroneously assumed that the Maui County Charter authorized the BVA to resolve disputes concerning the interpretation of a state law. In this regard, Pono argues that *Kona Old* is distinguishable from the instant case because in *Kona Old* the Hawai'i County Charter authorized the Board of Appeals to determine *all* appeals from the actions of the planning director and planning commission, whereas here, Section 8–5.4(2) (1988) of the Maui County Charter authorized the BVA only to "[h]ear and determine appeals alleging error from any person aggrieved by a *decision or order of any department charged with enforcement of zoning, subdivision, and building ordinances.*" (Emphasis in opening brief.)

Pono contends that at issue in the Stipulated Count I was not the enforcement of a county zoning, subdivision, or building ordinance, but, rather, the interpretation of a state statute. Pono adds that "[b]ecause Count I does not relate to the enforcement of a *county* zoning, subdivision, or building *ordinance*, and the charter does not authorize appeals of decisions regarding the applicability of HRS Chapter 205, [Pono] had no reason to administratively appeal the issue to any county agency. Such an appeal would have been futile." (Emphasis in opening brief.)

Pono cites to *GATRI v. Blane*, 88 Hawai'i 108, 962 P.2d 367 (1998), in support of this argument. GATRI, a Hawai'i general partnership, submitted a special management area (SMA) permit application to the Planning Department of the County of Maui for

construction of a restaurant park commercial project on GATRI's property. *Id.* at 109, 962 P.2d at 368. The proposed use was allowable under B–R Resort/Commercial zoning. *Id.* A contested case hearing on GATRI's application was held before the Maui Planning Commission, after which a hearing officer "recommended denial of the permit application on the grounds that the proposed development was inconsistent with the community plan for the parcel." *Id.* The planning commission voted to defer any action on GATRI's application "until potential changes to the community plan were voted on by the Maui county counsel." *Id.*

Roughly four years later, GATRI submitted an application for a minor SMA permit for construction of a snack shop on the same piece of its property. *Id.* The minor permit application went for processing to the director of the Department of Planning, who informed GATRI that GATRI's proposed use of the property was inconsistent with the county general plan. *Id.*

GATRI appealed the director's decision to the circuit court. *Id.* at 110, 962 P.2d at 369. GATRI argued that the decision "was erroneous because a development which is consistent with the governing zoning ordinance is *per se* consistent with the general plan." *Id.* The director argued that GATRI's appeal should be dismissed because "GATRI had not exhausted its administrative remedies" and "the Director's determination was not erroneous." *Id.* After a hearing, the circuit court ordered judgment in favor of GATRI. *Id.* The circuit court found, in relevant part, that the director's decision was "in effect a denial of GATRI's request for a special management area minor permit and is thus a final decision for purposes of HRS § 91–14." *Id.* (brackets omitted). The circuit court added that "[n]either the Revised Charter of the County of Maui, the Maui County Code nor the Maui SMA Rules provide the Maui Planning Commission with the authority to review decisions of the Director." *Id.* (brackets in original omitted).

The director appealed to the Hawai'i Supreme Court, arguing that, inter alia, the circuit court did not have jurisdiction over the agency appeal. *Id.* at 111, 962 P.2d at 370. The director argued that GATRI had not exhausted its administrative remedies because GATRI had to appeal to the Maui Planning Commission before it could appeal to the circuit court. *Id.* The Hawai'i Supreme Court held:

> There is no express procedure provided in the Maui charter or the Maui SMA rules for an appeal of the Director's decision on a minor permit application to the Commission. The Commission [under Maui SMA rules § 12–202–14] has delegated the authority to render a final decision on a minor permit application to the Director. The Director is required to *notify* the Commission of permits which he has granted. Based on [*Hawaii's Thousand Friends v. City and County of Honolulu,* 75 Haw. 237, 858 P.2d 726 (1993) ], we hold that, under this scheme, the circuit court had jurisdiction over this appeal of a final decision of the Director. Therefore, GATRI exhausted its administrative remedies.

*Id.* at 111 & 112, 962 P.2d at 370 & 371 (footnote omitted; emphasis in original; bracketed material added).

The supreme court explained that in *Kona Old,* it had distinguished the holding in *Hawaii's Thousand Friends v. City and County of Honolulu,* 75 Haw. 237, 858 P.2d 726 (1993):

> In *Thousand Friends,* we distinguished *Kona* because of the different language contained in the Revised Charter of the City and County of Honolulu. The Honolulu charter established a procedure for appeals from actions of the Department of Land Utilization (DLU) to the Zoning Board of Appeals only for those DLU actions concerning "the administration of the zoning and subdivision ordinances and any rules and regulations adopted pursuant thereto." *Thousand Friends,* 75 Haw. at [242], 858 P.2d at [729–30]. The challenged action involved an environmental group's petition for a declaration that the City had to obtain a SMA permit for its proposed demolition of structures within the coastal zone management area. The Honolulu charter did not specifically provide for appeals of declaratory judgments regarding the necessity for obtaining a

SMA permit. Therefore, we held that the circuit court had jurisdiction to entertain a direct appeal of the DLU action.

*GATRI*, 88 Hawai'i at 111–12, 962 P.2d at 370–71.

In the Stipulated Count I, Pono argued it was entitled to a declaratory judgment that Molokai Ranch's resort operations associated with the Project were prohibited on class C, D, E or U agricultural lands unless and until Molokai Ranch applied for and received a special use permit or boundary amendment pursuant to HRS Chapter 205.

Under HRS Chapter 205, all land in the state of Hawai'i is to be classified by the LUC into one of four districts or zones: urban, rural, agricultural, and conservation. HRS § 205–2(a) (2001). Land in the agricultural district is further divided into classifications as "A or B" land or as "C, D, E or U" land according to its soil productivity. HRS § 205–4.5 (2001 Repl.). Chapter 205 establishes permissible uses for land in the rural and agricultural districts. HRS §§ 205–4.5 & –5 (2001 Repl.). Within the agricultural district, Chapter 205 imposes greater restrictions on class A or B land. HRS §§ 205–4.5 & –5.

It is undisputed that Molokai Ranch's proposed Project was to be built on agricultural land having a soil classification of C, D, E or U.

Hawaii Revised Statutes § 205–12 (2001 Repl.) provides:

§ **205–12 Enforcement.** The appropriate officer or agency charged with the administration of county zoning laws shall enforce within each county the use classification districts adopted by the land use commission and the restriction on use and the condition relating to agricultural districts under section 205–4.5 and shall report to the commission all violations.

Hawaii Revised Statutes § 205–15 (2001 Repl.) provides:

§ **205–15 Conflict.** Except as specifically provided by this chapter and the rules adopted thereto, neither the authority for the administration of chapter 183C [5] nor the authority vested in the counties under section 46–4 [6] shall be affected.

(Footnotes not in original.)

Hence, pursuant to Chapter 205, Hawai'i has a two-tiered zoning scheme in which state and local zoning laws co-exist. Under this system, each county is charged with enforcing within that county the conditions relating to agricultural districts under HRS § 205–4.5.

In addition, at the time of the events that led to Pono's lawsuit, Section 8–5.4(2) of the Maui County Charter provided in pertinent part:

**Section 8–5.4. Board of Variances and Appeals. . . .**

In accordance with such principles, conditions and procedures prescribed by the council, the board of variances and appeals shall:

. . . .

2. Hear and determine appeals alleging error from any person aggrieved by a decision or order of any department charged with the enforcement of zoning, subdivision and building ordinances[.]

Rules regarding the processing of permits in Maui County are encapsulated in Chapter 19.500 of the Maui County Code. According to § 19.500.010 of the Code, the purpose and intent of Chapter 19.500 is "to ensure compliance with all provisions of this title and to describe how permit applications are to be processed." Further, § 19.500.020 provides that "[n]o person shall erect, construct, enlarge, extend, structurally alter, or use any building, structure, or parcel of land which does not conform to the provisions of this title or to the plans required to be approved by the director of public works or the director's authorized representative."

Section 19.500.040(A) and (B)(1) of the Maui County Code provides in relevant part:

A. Administrative Officer Designated. It shall be the duty of the director of public works of the County to administer and enforce the provisions of this title, and

---

**5.** HRS Chapter 183C is entitled "Conservation District."

**6.** HRS § 46–4 (1993) is entitled "County zoning."

therefore, the director of public works shall be known as the administrative officer of this title. Nothing in this article shall be construed to abrogate the authority and responsibilities of the planning director, Maui planning commission, and Molokai planning commission, set forth in this title and in the charter of the County.

B. Duties of Administrative Officer.

1. Generally. In its duty to approve applications for subdivision, building, certificate of occupancy, sign, grading, plumbing, electrical, or other development or construction permits, the director of public works shall approve an application which complies with the provisions of this title. The director of public works shall use the director's best effort to prevent and detect any violation of the provisions of this title and to secure the correction of these violations.

Section 19.500.050(A) provides:

A. Upon receiving an application for a building permit required by the building code of the County, the director of public works shall determine whether the application conforms to the requirements of this title. No building permit shall be issued unless the director of public works, or the director's authorized designee, certifies that the proposed construction and use of the premises conform to all applicable provisions of this title.

Based on the above sections of the Maui County Code, the Maui Department of Public Works and Waste Management was charged in the instant case with "the enforcement of zoning, subdivision and building ordinances." Maui County Charter § 8–5.4(2). Therefore, pursuant to § 8–5.4(2), the BVA had the authority "to hear and determine appeals alleging error from any person aggrieved by a decision or order" of Director Jencks.

The instant case is similar to *Kona Old,* for the reasons given by the Special Master in his Special Master's Report. This case is distinguishable from *GATRI* because, here, the Maui County Charter provided an express procedure for appealing Director Jenck's decision.

Given the foregoing, I would hold that Pono did not exhaust its administrative remedies prior to bringing suit in the circuit court because Pono did not appeal Director Jenck's decision to the BVA.

It is notable that in its memorandum in opposition to Molokai Ranch's Motion No. 4, Pono argued that the circuit court had jurisdiction to address Count I in part because

even if the December 1995 Jencks Letter was a "decision and order" appealable under § 8–5.4(2) to the [BVA], [Pono] had no notice of the existence of the December 1995 Jencks Letter until long after the applicable deadline for taking an appeal to the BVA and thus no administrative remedy was available to [Pono], relieving [Pono] of the obligation to exhaust this non-existent remedy.

Pono does not argue these points on appeal, and "[p]oints not argued may be deemed waived." Hawai'i Rules of Appellate Procedure Rule 28(b)(7). However, since there was no formal notice to Pono of the granting of the building permits, there may not have been any relief available to Pono when it did not monitor the issuance of building permits to Molokai Ranch. I interpret *Kona Old* to stand for the proposition that such notice was not required.

## IV.

Pono alleges that the circuit court erroneously assumed that a county agency may resolve disputes concerning the interpretation of HRS Chapter 205. Pono maintains that Chapter 205 does not give counties the authority to determine the allowable uses of agricultural land. Rather, Pono asserts, a "state agency, with expertise, is charged with enacting rules and administering the State Land Use Law."

Pono argues that while counties are obliged to enforce Chapter 205, the State retains the authority to determine whether a particular use is consistent with that chapter. Pono adds that it filed its complaint with the circuit court because Molokai Ranch never sought formal Chapter 205 approval from the LUC or the county.

Pono distinguishes HRS Chapter 205, the State Land Use Law, from HRS Chapter 205A, the CZMA, which was at issue in *Kona Old.* Pono argues:

> Pursuant to HRS Chapter 205A, the counties are "responsible for the administration of the special management area use permit procedure and requirements" and where implementation of policies "has been delegated in large part to the counties[.]" *Mahuiki v. Planning Commission*, 65 Haw. [at] 517, 654 P.2d [at] 881. Administration, implementation and enforcement of special management area permits are county responsibilities. *Id.* and *Kona Old*, [69 Haw.] at 88–89[ &] 93[, 734 P.2d at 166 & 169]. In contrast, [C]hapter 205 provides for a "dual state and county land use designation approach." [*Save Sunset Beach Coalition v. City and County of Honolulu*, 102 Hawai'i 465, 481, 78 P.3d 1, 17 (2003) ]. While the counties are obliged to enforce [C]hapter 205, the state retains the authority to determine whether a particular use is consistent with HRS [C]hapter 205.

The counties have the authority to determine whether a particular use is consistent with Chapter 205. Section 19.500.050(A) of the Maui County Code provides in pertinent part:

> A. Upon receiving an application for a building permit required by the building code of the County, the director of public works shall determine whether the application conforms to the requirements of this title. No building permit shall be issued unless the director of public works, or the director's authorized designee, certifies that the proposed construction and use of the premises conform to all applicable provisions of this title.

Certainly, pursuant to his authority to "determine whether [an] application conforms to the requirements of [Chapter 205]," Director Jencks was authorized to interpret Chapter 205 to determine the allowable uses of Molokai Ranch's agricultural land.

## V.

Pono argues that the circuit court's decision conflicts with the need for uniformity and consistency in the interpretation of a law of statewide concern. Pono asserts that uniform interpretation of HRS Chapter 205 cannot be secured through idiosyncratic county determinations. However, HRS Chapter 205 vests the counties with the authority to enforce within each county the conditions relating to agricultural districts under HRS § 205–4.5.

Since the circuit court did not err in dismissing Pono's Amended Complaint for lack of jurisdiction, Pono's remaining point of error is moot.

For the foregoing reasons, I would affirm the Amended Final Judgment filed on December 14, 2006 in the Circuit Court of the Second Circuit.